# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SALERNO MEDICAL ASSOCIATES, LLP,<br><br>Plaintiff,<br><br>v.<br><br>INTEGRITY PRACTICE SOLUTIONS, LLC; INTEGRITY MEDICAL SYSTEMS, LLC; CHINTAN TRIVEDI; JOHN DOES 1-10; and ABC CORPORATIONS 1-10,<br><br>Defendants. | Civil Action No.<br>2:20-cv-07076-JMV-JBC<br><br>Hon. John M. Vazquez, U.S.D.J.<br>Hon. James B. Clarke, U.S.M.J.<br><br>**Returnable: July 6, 2020**<br><br>**ORAL ARGUMENT REQUESTED** |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

---

**MANDELBAUM SALSBURG**
A Professional Corporation
3 Becker Farm Road – Suite 105
Roseland, New Jersey 07042
Tel. 973-736-4600
Fax. 973-736-4670
Attorneys for Plaintiff
  Salerno Medical Associates, LLP

On the Brief:

Christopher G. Salloum, Esq.
Steven W. Teppler, Esq.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS .................................................................................... 4

ARGUMENT ...................................................................................................... 12

I.    SMA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS. 12

    A.    SMA Will Likely Succeed on the Merits of its
          Claims Under the Computer Fraud and Abuse
          Act and the New Jersey Computer Related Offenses Act. ................... 13

    B.    SMA Will Likely Succeed on the Merits of its
          Misappropriation Claims. ............................................................ 17

    C.    SMA Will Likely Succeed on the Merits of Its
          Unfair Competition Claim. .......................................................... 22

    D.    SMA Will Likely Succeed on the Merits of its
          Breach of Fiduciary Duty and Duty of Confidence Claims. .............. 23

II.   SMA WILL CONTINUE TO SUFFER IRREPARABLE HARM
    IN THE ABSENCE OF INJUNCTIVE RELIEF. .................................... 25

III.  DEFENDANTS WILL SUFFER NO HARM IF
    THE INJUNCTION IS GRANTED, THUS TILTING THE BALANCE
    OF THE EQUITIES DECIDEDLY IN SMA'S FAVOR. ....................... 27

IV.   THE PUBLIC INTEREST FAVORS AN INJUNCTION. ........................ 28

CONCLUSION ................................................................................................... 29

# TABLE OF AUTHORITIES

<u>Cases</u>

*Acierno v. New Castle County*,
   40 F.3d 645 (3d Cir. 1994) .................................................................. 25

*Allan Dampf, P.C. v. Bloom*,
   127 A.D 2d 719 (N.Y. App. Div. 1987) ............................................. 20

*American Telephone & Telegraph, Co. v. Wimback and Conserve Program, Inc.*
   42 F.3d 1421 (3d Cir. 1994) ............................................................... 28

*Austar Int'l Limited v. AustarPharma LLC*,
   425 F. Supp. 3d 336 (D.N.J. 2019) .................................................... 18

*AYR Composition, Inc. v. Rosenberg*,
   261 N.J. Super. 495 (App. Div. 1993) ................................................ 20

*Battenkill Veterinary Equine P.C. v. Cangelosi*,
   768 N.Y.S.2d 504 (N.Y. App. Div. 2003) .......................................... 25

*Becker v. Toca*,
   No. 07-7202, 2008 WL 4443050 (E.D.La. Sept. 26, 2008) ............... 16

*Bell Helicopter Textron Inc. v. Tridair Helicopters, Inc.*,
   982 F. Supp. 318 (D. Del. 1997) ........................................................ 22

*BigStar Entm't Inc. v. Next Big Star, Inc.*,
   105 F. Supp. 2d 185 (S.D.N.Y. 2000) ............................................... 12

*Bimbo Bakeries U.S.A., Inc. v. Botticella*,
   613 F.3d 102 (3d Cir. 2010) ............................................................... 26

*Campbell Soup Co. v. ConAgra, Inc.*,
   977 F.2d 86 (3d Cir. 1992) ................................................................. 12

*Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*,
   696 F. Supp. 57 (D. Del. 1988) .......................................................... 23

*Condux Int'l, Inc. v. Haugum*,
  No. 08-4824, 2008 WL 5244818 (D. Minn. Dec. 15, 2008) ............................. 16

*Expediters Int'l of Wash., Inc. v. Direct Line Cargo Mgmt. Servs., Inc.*,
  995 F. Supp. 468 (D.N.J. 1988) ........................................................................... 25

*F.G. v. MacDonnell*,
  150 N.J. 550 (1995) ............................................................................................. 23

*Hoffman-La Roche, Inc. v. Genpharm, Inc.*,
  50 F. Supp. 2d 367 (D.N.J. 1999) ....................................................................... 23

*In re: Phoenix Dental Systems, Inc.*,
  144 B.R. 22 (Bankr. W.D. Pa. 1992) ................................................................... 20

*Ingersoll-Rand Co. v. Ciavatta*,
  110 N.J. 609 (1988) ............................................................................................. 22

*Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Americas*,
  74 A.D.3d 696 (N.Y. App. Div. 1020) ................................................................ 25

*Kos Pharms. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ................................................................................ 25

*Lamorte Burns & Co., Inc. v. Walters*,
  167 N.J. 285 (2001) ....................................................................................... 19, 21

*Marsellis -Warner Corp. v. Rabens*,
  51 F. Supp. 2d 508 (D.N.J. 1999) ....................................................................... 28

*National Reprographics, Inc. v. Strom*,
  621 F. Supp. 2d 204 (D.N.J. 2009) ..................................................................... 25

*NVR Inc. v. Davern*,
  No. 15-5059, 2015 WL 9450831 (D.N.J. Dec. 23, 2015) ............................ 26, 27

*Oburn v. Shapp*,
  521 F.2d 142 (3d. Cir. 1975) .............................................................................. 12

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014).......................................................................................... 14

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
    143 F.3d 800 (3d Cir. 1998) ............................................................................ 25

*Platinum Mgmt., Inc. v. Dahms*,
    285 N.J. Super. 274 (Law. Div. 1995).............................................................. 21

*Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*,
    648 F.3d 295 (6th Cir. 2011) ........................................................................... 14

*Read v. Profeta*,
    397 F. Supp. 3d 597 (D.N.J. 2019).................................................................. 23

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ............................................................................ 12

*Scherer Design Grp., LLC v. Schwartz*,
    No. CV 18-3540, 2018 WL 3613421 (D.N.J. July 26, 2018)........................... 18

*Smith v. BIC Corp.*,
    869 F.2d 194 (3d Cir. 1989) ............................................................................ 19

*Strouchler v. Shah*,
    891 F. Supp. 2d 504 (S.D.N.Y. 2012) ............................................................. 26

*Total Care Physicians, P.A. v. O'Hara*,
    798 A.2d 1043 (Del. Super. 2001).................................................................... 20

*United States v. De Cavalcante*,
    440 F.2d 1264 (3d Cir. 1971) .......................................................................... 15

*United States v. Turley*,
    352 U.S. 407 (1957)......................................................................................... 17

*US Bioservices Corp. v. Lugo*,
    595 F. Supp. 2d 1189 (D. Kan. 2009).............................................................. 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..............................................................................12

*Zippertubing Co. v. Teleflex, Inc.*,
    757 F.2d 1401 (3d. Cir. 1985) ........................................................21

<u>Statutes</u>

18 U.S.C.  § 1030.....................................................................*passim*

18 U.S.C. § 1836.............................................................................26

18 U.S.C. § 1839................................................................18, 19, 21

N.J.S.A. § 2A:38A-1 .......................................................................13

N.J.S.A. § 56:15-1 .....................................................................18, 21

N.J.S.A. § 56:15-2 ................................................................18, 19, 21

N.J.S.A. § 56:15-3 ...........................................................................26

N.J.S.A. 2A:38A-3...........................................................................17

<u>Treatises</u>

Restatement (Second) of Torts (1979)............................................23

Restatement (Third) of Unfair Competition ................................25

## PRELIMINARY STATEMENT

Plaintiff, Salerno Medical Associates, LLP ("**Plaintiff**" or "**SMA**"), respectfully submits this Memorandum of Law in support of its application for a preliminary injunction (the "**Motion**") preliminarily enjoining defendants, Integrity Medical Systems, LLC ("**IMS**"), Integrity Practice Solutions, LLC ("**IPS**"), Chintan Trivedi ("**Mr. Trivedi**"), John Does 1-10, and ABC Corporations 1-10 (all named defendants collectively, "**Defendants**"), and all persons and entities working in concert with them, from deleting, modifying, and denying or otherwise restricting SMA's access to SMA's 16,000 (past and present) patients' protected health information ("**PHI**") housed on IMS's servers, including, without limitation, patients' names, patients' telephone numbers, patients' addresses, patients' medical records, patients' radiograph images, laboratory results, and other information and documents regarding a patient's health status and the provision of, and payment for, medical services provided to SMA patients (the "**SMA Patient Data**") and requiring Defendants to return the SMA Patient Data to SMA forthwith.

This matter arises out of IMS's attempt to extort money from SMA in blatant misappropriation of SMA's most precious of assets: the SMA Patient Data, which belong to SMA but are housed on IMS's servers pursuant to an agreement between IMS and SMA whereby SMA entrusted IMS with the SMA Patient Data in connection with certain electronic medical recordkeeping ("**EMR**") services

provided by IMS.  Notwithstanding, however, that IMS does not own the SMA Patient Data, IMS is now refusing to return the same to SMA unless and until SMA first pays, in full, the outstanding balance that SMA allegedly owes (but which SMA vehemently disputes) to both IMS *and* IPS, a separate entity SMA engaged in 2016 to provide billing and certain other administrative services and which, like IMS, is owned and/or controlled by co-defendant Mr. Trivedi and both of which operate out of Mr. Trivedi's residential address in Basking Ridge, New Jersey.

Indeed, IMS, through Mr. Trivedi and his counsel, has also expressly threatened that, should SMA fail to acquiesce to IMS's extortionary demands for money allegedly due, in addition to continuing to refuse to transfer the SMA Patient Data to SMA, IMS will also terminate or restrict SMA personnel's access to the SMA Patient Data.  Worse still, after the parties' attempts to amicably resolve their dispute failed, IMS has caused SMA to experience daily, significant, and pervasive interruptions in the availability of the SMA Patient Data, severely undermining its ability to treat its patient population.

The issue whether Defendants are entitled to payment, if any, is irrelevant to the present action and can and should be resolved at a later date, in a different forum, and without prejudice to any party.  But it is illegal for IMS to deny SMA's request to return the SMA Patient Data or restrict SMA's access thereto unless SMA first acquiesces to Defendants' monetary demands.

The need, therefore, for the entry of the preliminary injunction that SMA is requesting here is manifest.  IMS has and continues to suffer immediate and irreparable harm, including, most importantly, interference with its ability to treat its patients.  The public interest will also be served by enjoining Defendants' egregious actions because those actions are affecting the medical care of thousands of innocent patients.

Indeed, if granted, the relief that SMA is seeking — the return of the SMA Patient Data containing its patients' PHI — advances the public health, safety, and welfare, by ensuring that thousands of people are guaranteed not only continuity of good medical care by SMA and its providers, but also the continued right to access and assess their medical records.  Conversely, IMS's ongoing attempted extortion of SMA, and IMS's ongoing misappropriation of the SMA Patient Data, serve no public interest whatsoever.

For the reasons explained briefly herein, the Motion should be granted.

## STATEMENT OF FACTS

For brevity's sake, SMA incorporates by reference the factual allegations of its Verified Complaint and the Declarations of Luz Chapa, Darlene Serrano Reiter, and Matthew Rehm, filed simultaneously therewith, as if the same were set forth verbatim herein.  SMA, however, emphasizes the following:

In 2014, SMA entered into an agreement with IMS pursuant to which IMS agreed to provide EMR-related services to SMA (the "**EMR Agreement**"). (Compl., at ¶ 24).   Specifically, under the EMR Agreement, IMS provides installation, project management, training, implementation, and support services to SMA in connection with the Meditab EMR software that IMS licenses to SMA, and, upon information and belief, to other medical practices. (Compl., at ¶ 25).   In addition, the EMR Agreement also requires IMS to assume the responsibility for hosting the SMA Patient Data on its New York-based servers.  (Compl., at ¶ 26).

Under the terms of the EMR Agreement, IMS agreed that it would ensure that the SMA Patient Data would be available to SMA, on demand, 24 hours a day, 7 days a week, with only limited, off-hour, interruptions for routine maintenance. (Compl., at ¶ 27).  SMA, during the course of treating SMA's patients and through its medical providers and staff , inputs the SMA Patient Data into the Meditab EMR software licensed to SMA through IMS. The SMA Patient Data is simultaneously

uploaded onto IMS's servers consistent with the EMR Agreement.  (Compl., at ¶ 28).

At all relevant times, SMA was, and remains, the sole owner of the SMA Patient Data.  (Compl., at ¶ 29).  At no point in time did SMA transfer ownership, in whole or in part, of the SMA Patient Data to IMS.  (Compl., at ¶ 30).  At no point in time did SMA agree that its access to, or ability to retrieve a complete copy of, the SMA Patient Data would be contingent upon SMA's satisfaction of any claim for payment that IMS, IPS, or Mr. Trivedi would make.  (Compl., at ¶ 31).  Throughout the course of SMA's and IMS's business relationship, SMA and its providers entrusted IMS with the safeguarding of more than 16,000 of SMA's patients' PHI.  (Compl., at ¶ 32).

In order to safeguard the confidentiality and privacy of its patients' PHI contained in the SMA Patient Data, SMA ensures that only select clinical and administrative SMA personnel possess the ability to access the SMA Patient Data using the Meditab EMR software licensed to SMA through IMS.  (Compl., at ¶ 33).  In addition, as a precondition to accessing the SMA Patient Data, SMA requires its personnel to undergo appropriate privacy training.  (Compl., at ¶ 34).

Throughout the duration of the EMR Agreement, SMA remitted $285,515.31 to IMS as payment in full for the aforesaid EMR-related services.  (Compl., at ¶ 35).  During approximately the same period of time, SMA remitted $427,786.00 to IPS

for various services rendered pursuant to SMA's separate agreement with IPS. (Compl., at ¶ 36).

At the end of 2019, SMA became — and, upon information and belief, Mr. Trivedi came to realize that SMA had become — dissatisfied with IMS's and IPS's services (particularly, but not exclusively, with their billing practices), causing SMA to seek to satisfy its EMR management needs elsewhere.  (Compl., at ¶ 37).  As a non-limiting example of one of the bases for SMA's desire to sever its ties with IMS, SMA discovered evidence that IMS had been billing SMA in a manner inconsistent with the terms of the EMR Agreement.   (Compl., at ¶ 38).

In particular, and again without limitation, IMS fabricated the existence of past-due invoices dating between 2014 and 2015, and presented such alleged past-due invoices to SMA, claiming SMA still owed it money for services provided, although payment for such services had been made many years prior.  (Compl., at ¶ 39).  IMS's own history of billing, together with SMA's conclusive documentary evidence that monies owed to IMS were in fact, paid to IMS, reveal the glaring and shameless extent of such fabrication.  (Compl., at ¶ 40).  For example, by way of a June 28, 2018 email sent to SMA, Mr. Raghav, an individual employed by Mr. Trivedi, sent SMA a Microsoft Excel spreadsheet documenting the outstanding balance allegedly owed to IMS by SMA for EMR services as of June 28, 2018. (Compl., at ¶ 40).  That document revealed no balance outstanding for services IMS

provided in the years 2014 and 2015.   (Compl., at ¶ 40).  Yet, years later, and

months into the dispute between the parties described herein, IMS, again through

Mr. Raghav, claimed that SMA owed IMS $87,572.19, most of which was alleged

to have been for EMR services IMS allegedly provided from January 2014 through

December 2015.   (Compl., at ¶ 40).

        In that same email, IMS also acknowledged that, throughout the duration of

the parties' relationship, IMS invoiced SMA in the total amount of $262,619.66.

(Compl., at ¶ 40).  As noted previously, however, SMA had already paid IMS the

aggregate amount of $285,515.31 — $22,895.65 *more* than the total amount that

IMS represented had been invoiced to SMA.  (Compl., at ¶ 40).  As such, not only

did SMA not have an outstanding balance for EMR services provided in 2014 and

2015, IMS actually owed, and still owes, SMA a refund in the amount of at least

$22,895.65.  (Compl., at ¶ 29).

        The aforesaid fraudulent or misleading accounting practices, together with,

among other things, IMS's failure to provide the quality customer services that SMA

expected from its EMR provider, caused SMA to determine to end its relationship

with IMS.  (Compl., at ¶ 41).  In late 2019, SMA affirmatively demanded that IMS

return the SMA Patient Data.  (*See* Capcha Decl., at ¶ 42).  In so doing, SMA made

clear that IMS's scope of authority with respect to the SMA Data became limited to

the facilitation of the migration of the SMA Patient Data back to SMA.  (Compl., at

¶ 43).  SMA agreed to pay a reasonable migration fee to cover any costs that IMS might incur in connection with said data migration.  (Compl., at ¶ 44).

Upon information and belief, however, to avoid losing a valuable account like SMA's — which had generated for Mr. Trivedi $714,301.31 in revenue in an approximately five-year-long period — Mr. Trivedi resorted to the only leverage he has over SMA: the SMA Patient Data.  (Compl., at ¶ 45).  Mr. Trivedi refused to cause the return the SMA Patient Data to SMA unless and until SMA pays, in full, the fraudulent amounts that IMS falsely claims SMA still owes to IMS, together with amounts allegedly owed to Mr. Trivedi's other entity, IPS.  (Compl., at ¶ 46). Despite repeated subsequent demands to Mr. Trivedi, IMS and Mr. Trivedi have refused to return to SMA its property, effectively holding hostage SMA, and, more importantly, the PHI for SMA's approximately 16,000 patients, in return for payment of ransom.  (Compl., at ¶ 47).

Mr. Trivedi and IMS have failed to return the SMA Patient Data notwithstanding receiving assurances from SMA that SMA would, subsequent to the return of the SMA Patient Data, agree to resolve, in good faith, any billing dispute that may exist between SMA and IMS and IPS in an appropriate forum.  (Compl., at ¶ 48).  By an October 14, 2019 telephone conversation with SMA's Practice Development Manager, Ms. Darlene Serrano Reiter, Mr. Trivedi affirmatively

threatened to "dump" SMA from IMS's servers if SMA refuses to pay the amounts allegedly owed to IMS and IPS.  ("**Mr. Trivedi's Threat**")  (Compl., at ¶ 49).

By letter dated May 19, 2020, Mr. Trivedi's attorney, Dan Frier of Frier Levitt, LLP, affirmatively stated to SMA's counsel that the SMA Patient Data would be returned to SMA only on the condition that SMA pay the amounts allegedly owed to IMS and IPS (the "**FL Communication**", with Mr. Trivedi's Threat, the "**Extortionate Communications**").  (Compl., at ¶ 50).   In the approximate two-week period of time immediately preceding the initiation of this lawsuit, after it became evident to all parties, despite SMA's good-faith attempts to settle, that this dispute would not resolve short of litigation, SMA's access to the SMA Patient Data has been substantially disrupted in that certain SMA users, at random,  are kicked off of, and lose the ability to login to, the Meditab software that is licensed to SMA through IMS (the "**Recent Impairment to SMA's Patient Data**"), thereby losing the capacity to access crucial patient PHI necessary to treat patients and also losing the capacity to update said patients' medical records.   (Compl., at ¶ 51).  These periods of disruption last, on average, between twenty (20) to ninety (90) minutes, and occur during SMA's regular business hours when patients are being treated. When these incidents occur, an error message pops up on the SMA user's computer that says: "The remote computer has ended the connection."  (Compl., at ¶ 52).

The Recent Impairment to SMA's Patient Data has resulted in, at any single point in time during SMA's regular business hours, approximately 30-50 of SMA's users being rendered incapable of logging into the Meditab EMR software that SMA licenses through IMS and accessing the SMA Patient Data housed on IMS's servers. (Compl., at ¶ 53).

Upon information and belief, IMS, through Mr. Trivedi, is purposefully causing the Recent Impairment to SMA's Patient Data. (Compl., at ¶ 54).

When SMA raised the issue of the Recent Impairment to SMA's Patient Data to IMS, IMS responded with delay and obfuscation by requesting that SMA provide IMS with additional burdensome details that IMS had never before required to resolve any issues that may have previously emerged regarding the SMA Patient Data. (Compl., at ¶ 55).

As recently as June 9, 2020, the day before the filing of the Verified Complaint in this matter, SMA, through an email sent to Mr. Trivedi by Ms. Luz Capcha of SMA, made clear to IMS that IMS was engaged in delay with respect to the Recent Impairment to SMA's Patient Data, and repeated SMA's demand that the SMA Patient Data be immediately returned. In her email, Ms. Capcha stated as follows:

> If IMS had complied with SMA's demand, first made at the end of 2019, that IMS immediately return to SMA our patient data, which is SMA's property, we would not be in this position right now. In the past, whenever we had connectivity issues (although such issues were never as significant and pervasive as they have become since the

10

emergence of this dispute between us), you never requested that we first clear the kinds of obstacles that you are now creating with the obvious retaliatory purpose of delaying us and frustrating the care that SMA is providing to our patients.

Please immediately transfer our data to us.  It is wrong for you and IMS to continue to hold the same hostage.  Please be reminded that IMS no longer possesses the authority to continue to use SMA's data as it had been prior to our data transfer demand.

In the meantime, please fix the issues I've identified so that we can treat our patients until the data migration is complete.  I believe that I have been specific enough with respect to the issues we are experiencing.  If you have any questions, please don't hesitate to call me at any time.

(Compl., at ¶ 56).

In his response to Ms. Capcha's email, Mr. Trivedi ignored SMA's demand for the return of the SMA Patient Data, disregarded the significance of the consistent and pervasive disruptions, described above, that SMA has been experiencing for the past two weeks, and denied that the SMA Patient Data were being held hostage because, in his words, "SMA always has and continues to have access to the EMR software/platform and the data on it."  (Compl., at ¶ 57).

The next day, June 10, 2020, SMA filed a Verified Complaint against Defendant, and the present Motion followed.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a probability of irreparable harm in the absence of relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To support a preliminary injunction, a plaintiff must first show both a likelihood of success on the merits and a probability of irreparable harm. *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). Upon a threshold showing of a likelihood of success and irreparable harm, courts balance all four factors to determine whether to issue a preliminary injunction. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176-77 (3d Cir. 2017).

As explained below, the application of these standards to this case inevitably requires that SMA's Motion be granted.

## I.      SMA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

A likelihood of success on the merits does not require that success be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits. *Oburn v. Shapp*, 521 F.2d 142, 148 (3d. Cir. 1975); *see also BigStar Entm't Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000) (a plaintiff "need not show that

success is certain, only that the probability of prevailing is 'better than fifty percent'").  Here, SMA surpasses that burden.

### A. SMA Will Likely Succeed on the Merits of its Claims Under the Computer Fraud and Abuse Act and the New Jersey Computer Related Offenses Act.

The core, fundamental, wrong at issue is IMS's unabashed refusal to return the SMA Patient Data — which is indisputably SMA's property — to SMA, and IMS's retaliatory campaign to restrict or otherwise limit SMA's access to the same, unless and until SMA gives IMS and IPS money.  No legal authority exists to support the proposition that SMA may lawfully be deprived of its property under these circumstances.  To the contrary, such conduct squarely violates two long-established laws protecting computers and the information stored on them: the Computer Fraud and Abuse Act ("**CFAA**"), 18 U.S.C. § 1030, and the New Jersey Computer Related Offenses Act ("**CROA**"), N.J.S.A. § 2A:38A-1, *et seq.*  As explained below, SMA will likely succeed on the merits of those claims.

The CFAA prohibits, among other things, any person "with intent to extort from any person any money" from "transmit[ting] in interstate or foreign commerce any communication containing," as relevant here, either (1) a "threat to cause damage to a protected computer"; or (2) a "demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion."  18 U.S.C. § 1030(a)(7)(A) & (C).   The

CFAA defines "damage" to mean "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(7).  Because the CFAA does not define "impairment," "integrity," and "availability," those terms must be construed "in accordance with [their] ordinary meaning."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014); *see also Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011) (applying ordinary meaning to "impairment," "integrity," and "availability" and concluding that "a transmission that diminishes a plaintiff's ability to use data or a system" causes damage under the CFAA).  A CFAA claim may be maintained in a civil action so long as the alleged violations "involve[]," as relevant here, "the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals" or a "threat to public health or safety.  *See* 18 U.S.C. § 1030(g); 18 U.S.C. § 1030 (c)(4)(A)(i)(II) and (IV).

Here, the facts establishing SMA's likelihood of success on its claim under §1030 (A)(7) of the CFAA are clear and straightforward.

To begin, there have been at least two predicate communications that trigger CFAA liability under § 1030(A)(7).  First, Mr. Trivedi's telephone communication to Ms. Reiter in October 2019 threatening to "dump" the SMA Patient Data from IMS's servers unless SMA pays money constitutes a "threat to damage" a protected

computer, IMS's servers, by deleting ("dumping") the SMA Patient Data from the same, all within the meaning of 18 U.S.C. § 1030(A)(7)(A).  (Compl., at ¶ 49).  In addition to the context of this communication, which was made just days after a tense meeting between the parties to attempt to resolve a billing dispute and in which Mr. Trivedi demanded money, the fact that Mr. Trivedi's threat was conditioned on a demand for payment evinces a clear intent to extort money from SMA.  *See United States v. De Cavalcante*, 440 F.2d 1264, 1276 (3d Cir. 1971) (under New Jersey law, in order to constitute extortion, an extorter must make demand "under threat of injury to a person or property"); *accord* N.J.S.A. 2C:20-5(g) (a person commits the crime of theft by extortion if she "purposefully threatens to . . . [i]nflict any . . . harm which would not substantially benefit the actor but which is calculated to materially harm another person").

Second, Mr. Trivedi's May 2020 communication, through counsel, to SMA affirmatively stating that the SMA Patient Data would not be returned until after SMA pays its outstanding balance constitutes a "demand or request" for money "in relation to damage to a protected computer, where such damage was caused to facilitate the extortion," all within the meaning of §1030(A)(7)(C).  (Compl., at ¶ 50).  The relevant "damage" was, and continues to be, twofold: (1) IMS's refusal to return the SMA Patient Data, which has impaired, among other things, the integrity of SMA's Patient Data in that the same is being misused by IMS; and (2)

Defendants' retaliatory campaign to restrict SMA's ability to access the SMA Patient Data by essentially depriving, at any single point in time during regular business hours when patients are being treated, 30-50 SMA users of the ability to access and use the SMA Patient Data consistent with the needs of SMA's patients. *Accord Condux Int'l, Inc. v. Haugum*, No. 08-4824, 2008 WL 5244818, at \*8 (D. Minn. Dec. 15, 2008) (damage under the CFAA "requires some diminution in the completeness or usability of data or information on a computer system"); and *Becker v. Toca*, No. 07-7202, 2008 WL 4443050, at \*5 (E.D.La. Sept. 26, 2008) ("Error messages and slow processing constitute impairments to the integrity or availability of data."). The CFAA violations described herein caused SMA to suffer damage, as noted above, and, therefore, entitle SMA to appropriate injunctive and other equitable relief as expressly contemplated by the CFAA. *See* 18 U.S.C. §1030(g) (authorizing civil actions for CFAA violations "to obtain compensatory damages and injunctive or other equitable relief").

Moreover, the granting of such relief to SMA is appropriate and necessary because the CFAA violations here, all of which implicate actual and ongoing damage to PHI and threatened damage to PHI, unequivocally involve "the potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals" or a "threat to public health and safety" within the meaning of 18 U.S.C. §1030(g). Indeed, if the injunctive and equitable relief that

16

SMA is seeking here is not granted, the medical treatment and care of SMA's 16,000 past and active patients, which is predicated upon the on-demand retrievability of patient medical records, will be substantially affected.

The CROA is even broader than the CFAA.  It provides that any person or enterprise "damaged" in business or property as a result of certain statutorily enumerated computer-related offenses "may recover compensatory and punitive damages and the cost of the suit including a reasonable attorney's fee, costs of investigation and litigation."   Such offenses include, in pertinent part, the "purposeful or knowing, and unauthorized . . . taking . . . [of] any data[.]" N.J.S.A. 2A:38A-3.  Here, IMS has, without question, refused to return the SMA Patient Data, which is SMA's property, to SMA upon SMA's demand.  In so doing, IMS has exercised a right of ownership over SMA's property, the SMA Patient Data, without (and, in fact, contrary to) SMA's express or implied authorization, and has purposefully and without authorization, interfered with, or taken (stolen), "data" in violation of N.J.S.A. 2A:38A-3. *United States v. Turley*, 352 U.S. 407, 417 (1957) (interpreting the term "stolen" to include all takings of property "with intent to deprive the owner of the rights and benefits of ownership").

**B.    SMA Will Likely Succeed on the Merits of its Misappropriation Claims.**

The misconduct that has harmed — and, absent judicial intervention, will continue to harm — SMA is so severe that, in addition to violating the computer-

related offenses laws noted above, it also constitutes unlawful misappropriation in violation of the Defend Trade Secrets Act ("**DTSA**"), 18 U.S.C. § 1839, *et seq.*, the New Jersey Trade Secrets Act ("**NJSTA**"), N.J.S.A. 56:15-1, *et seq.*, and New Jersey common law proscribing the misappropriation of trade secrets and confidential information.  On these claims, too, SMA will likely succeed.

The elements for trade secret misappropriation under the DTSA and the NJTSA are similar.  Indeed, for courts within this District, "the analysis under DTSA folds into that of NJTSA."  *Scherer Design Grp., LLC v. Schwartz*, No. CV 18-3540, 2018 WL 3613421, at *4 (D.N.J. July 26, 2018), *aff'd sub nom.*, *Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147 (3d Cir. 2019); *see also Austar Int'l Limited v. AustarPharma LLC*, 425 F. Supp. 3d 336, 355 (D.N.J. 2019) (noting that the NJTSA and DTSA contain "virtually identical definitions of trade secret, misappropriation, and improper means").   Those elements, described below, are *prima facie* satisfied by SMA here.

**First**, a plaintiff must show the existence of a trade secret.  *See* N.J.S.A. § 56:15-2; 18 U.S.C. § 1839(3).  "[T]rade secret" is defined to include any:

> information, held by one or more people, without regard to form, including a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its

18

disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.J.S.A. 56:15-2; *accord* 18 U.S.C. § 1839(3).  *See also Smith v. BIC Corp.*, 869 F.2d 194, 199 (3d Cir. 1989) (identifying factors to be considered in determining whether certain information is a trade secret).

The SMA Patient Data — which contain, among other things, patient names, medical diagnoses, and other information and documents regarding a patient's health status and the provision of, and payment for, medical services provided to SMA patients — easily falls within the statutory definition.  As set forth above and in the accompanying Verified Complaint and supporting declarations, SMA has spent hundreds of thousands of dollars and expended substantial resources of time and energy over many years to develop its patients' medical records, and zealously restricts access to the SMA Patient Data to select, appropriately trained, SMA personnel and otherwise takes steps, such as training its staff, to ensure that the use of the SMA Patient Data is appropriately limited and that the same is not accessible to anyone other than authorized SMA personnel or the patients (and their medical providers) themselves.  (Compl., at ¶ 2).

Such a conclusion is consistent with the long-established rule in New Jersey that customer lists of service businesses are afforded protection as trade secrets. *Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 298 (2001); *AYR Composition,*

*Inc. v. Rosenberg*, 261 N.J. Super. 495, 504 (App. Div. 1993) ("Where a service company is concerned, the names and addresses of its customers are not open to and ascertainable by everyone; they are private information and property of the company.") (internal quotation omitted).

Indeed, courts across the Nation have ruled that patient information constitute trade secrets. *See*, *e.g.*, *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1054 (Del. Super. 2001) (determining that patient bills qualified as trade secrets because they "compile patient addresses, medical diagnoses and treatment codes, and specific patient insurance information, all of which are valuable data in the commercial operation of a medical practice, and all of which are generally unavailable in the public domain"); *US Bioservices Corp. v. Lugo*, 595 F. Supp. 2d 1189, 1195 (D. Kan. 2009) (concluding that, under the Kansas Trade Secrets Act, "trade secrets" may include patient lists); *In re: Phoenix Dental Systems, Inc.*, 144 B.R. 22, 25 (Bankr. W.D. Pa. 1992) (holding that "the names of the [dental clinic] Debtor's patients are a trade secret" and "are its most valuable asset"); *Allan Dampf, P.C. v. Bloom*, 127 A.D 2d 719, 720 (N.Y. App. Div. 1987) (concluding that defendant "converted protected trade secrets from the plaintiff [a dental practice] when he copied and used the information on the [patient] recall list").

Besides, under the New Jersey common law on misappropriation, it is well-settled that "information need not rise to the level of a trade secret to be protected."

20

*Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 299 (2001).   The key to determining the misuse of information is the relationship of the parties at the time of disclosure, and its intended use.   *Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 295 (Law. Div. 1995) (citing *Zippertubing Co. v. Teleflex, Inc.*, 757 F.2d 1401, 1407-10 (3d. Cir. 1985)).   And it is clear here that the nature of IMS's and SMA's relationship, in which SMA entrusted IMS with its most precious of its assets, patients' PHI, warrants protection under law.

**Second**, the plaintiff must show misappropriation of a trade secret.   *See* N.J.S.A. § 56:15-2; 18 U.S.C. § 1839(5).   Misappropriation is defined to include "use of a trade secret of another without express or implied consent of the trade secret owner by a person who . . . at the time of . . . use, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired through improper means."   N.J.S.A. § 56:15-1; *accord* 18 U.S.C. § 1839(5)(B)(ii).   Improper means is defined to include the "theft, [or]. . . breach . . . of an express or implied duty to . . . limit the use . . . of . . . a trade secret[.]".   N.J.S.A. § 56:15-1; *accord* 18 U.S.C. § 1839(6).

Here, SMA has *prima facie* shown that IMS has misappropriated the SMA Patient Data for a simple, but controlling, reason that IMS cannot evade: SMA has affirmatively and unequivocally revoked IMS's authorization to keep the SMA Patient Data on its servers, and has limited IMS's authorization to use the SMA

Patient Data only insofar as strictly necessary to cause the migration of the SMA Patient Data back to SMA. (Compl., at ¶ 85). By failing, therefore, to comply with SMA's directives vis-à-vis the SMA Patient Data, IMS has stolen the SMA Patient Data, essentially forcing SMA, under duress, to continue to use services that it does not want, and has thereby breached its duty to use the SMA Patient Data consistent with the scope of SMA's authorization. (Compl., at ¶ 86). *Accord*, *e.g.*, *Bell Helicopter Textron Inc. v. Tridair Helicopters, Inc.*, 982 F. Supp. 318, 321 (D. Del. 1997) ("[O]ne method of setting forth a trade secret misappropriation cause of action [under DE law] is by alleging that a person *used* a trade secret of another in circumstances where the person knew or had reason to know that the knowledge of the trade secret was acquired under circumstances where there was a duty to limit the use of the secret.") (emphasis added).

Based on the foregoing facts, which IMS cannot reasonably dispute, SMA is likely to succeed on the merits of its misappropriation-based claims.

## C. SMA Will Likely Succeed on the Merits of Its Unfair Competition Claim.

It is well-established that the "public has a clear interest in safeguarding fair commercial practices" and in protecting against the "theft . . . of trade secrets, confidential information, or, more generally, knowledge and technique in which the [owner] may be said to have a proprietary interest." *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 639 (1988). To that end, *Hoffman-La Roche, Inc. v. Genpharm, Inc.*,

50 F. Supp. 2d 367 (D.N.J. 1999), clearly establishes that misappropriation of a trade secret constitutes unfair competition under New Jersey law. *See id.*, at 381 ("The key to the tort of unfair competition is misappropriation of property of commercial value."). Under settled New Jersey law, therefore, by misappropriating the SMA Patient Data, as described above, Defendants have engaged in unfair competition. For this reason, SMA will likely succeed on the merits of this claim.

### D.     SMA Will Likely Succeed on the Merits of its Breach of Fiduciary Duty and Duty of Confidence Claims.

In addition to the above-discussed, likely to be successful, claims, IMS has also breached both its fiduciary duties to SMA arising from the EMR Agreement and the related duty of confidence. The "essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." *F.G. v. MacDonnell*, 150 N.J. 550, 561 (1995). "A fiduciary relationship arises between two persons when one person is under a duty to act for . . . the benefit of another on matters within the scope of their relationship." *Id.,* at 563 (citing RESTATEMENT (SECOND) OF TORTS §874, cmt. a (1979)). "[T]he dominant theme of the case law . . . is that fiduciary relationships arise where one party has the power and opportunity to take advantage of the other, because of that other's susceptibility or vulnerability[.]" *Read v. Profeta*, 397 F. Supp. 3d 597, 633 (D.N.J. 2019) (quoting *Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 696 F. Supp. 57, 75 (D. Del. 1988)).

By entering into the EMR Agreement with IMS, SMA placed its trust and confidence in IMS, which, by virtue of accepting responsibility for the SMA Patient Data, assumed a superior position with respect to the custodianship of SMA's most precious trade secrets and proprietary confidential information: its patients' PHI. (Compl., at ¶ 32). By virtue thereof, a fiduciary relationship arose between IMS and SMA with respect to the SMA Patient Data. Indeed, the EMR Agreement — by operation of SMA's trust that IMS would honor the security and confidentiality of the SMA Patient Data and would act only consistent with SMA's ownership interests in the same — effectively placed IMS (along with Mr. Trivedi and IPS, which are all, in truth, one in the same) in a position to take advantage of SMA vis-à-vis the SMA Patient Data, which is precisely what occurred here. It goes without saying that, had SMA known that IMS would attempt to extort money from SMA in connection with the SMA Patient Data, SMA would have declined to enter into a business relationship with IMS. And so IMS's unlawful actions, as set forth in the Verified Complaint, constitute breaches of IMS's fiduciary obligations to SMA with respect to the SMA Patient Data.

Similarly, a person to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret if the person "knew or had reason to know that the disclosure was intended to be in confidence, and . . . the other party to the disclosure was reasonable in inferring that the person consented to an obligation of

confidentiality." *Expediters Int'l of Wash., Inc. v. Direct Line Cargo Mgmt. Servs., Inc.*, 995 F. Supp. 468 (D.N.J. 1988) (citing Restatement (Third) of Unfair Competition § 41).  Applying this standard to the facts of this case, SMA will likely succeed on the merits of its breach of duty of confidence for the same reasons articulated above.

## II.     SMA WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF.

Defendants' conduct to date has caused and threatens to cause significant and irreparable harm to SMA.  A preliminary injunction is appropriate where, as here, a plaintiff is threatened with potential harm "which cannot be redressed by a legal or equitable remedy following a trial." *National Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 229 (D.N.J. 2009) (quoting *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)).  Grounds for irreparable injury include "loss of control of reputation, loss of trade, and loss of good will." *Id.* (citing *Kos Pharms. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004); *see also Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).  Irreparable injury may be established "where there is a danger that, unless enjoined, a misappropriator of trade secrets will . . . irreparably impair the value of those secrets." *Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Americas*, 74 A.D.3d 696, 697 (N.Y. App. Div. 1020); *accord Battenkill Veterinary Equine P.C. v. Cangelosi*, 768 N.Y.S.2d 504, 507 (N.Y. App. Div. 2003) ("Irreparable injury may be shown through a loss of

patients in a medical specialty, permanent loss of revenues from those patients or clients, and loss of referral business usually garnered from clients."); *Strouchler v. Shah*, 891 F. Supp. 2d 504, 522 (S.D.N.Y. 2012) (noting that "there is Second Circuit and out-of-circuit appellate law holding that the mere *threat* of a loss of medical care, even if never realized, constitutes irreparable harm").  Indeed, applicable law recognizes that an injunction is an appropriate remedy for misappropriation and unlawful computer-related acts.  *See*, *e.g.*, 18 U.S.C. § 1836(b)(3) (remedies include an injunction); N.J.S.A. § 56:15-3 (same); 18 U.S.C. §1030(g) (same); *see also NVR Inc. v. Davern*, No. 15-5059, 2015 WL 9450831, at *3 (D.N.J. Dec. 23, 2015) (improper use of trade secrets constitutes irreparable harm under the NJSTA).

Here, IMS's willful deprivation of, and attempts to extort SMA with respect to, the SMA Patient Data has caused, and is continuing to cause, SMA damage that cannot be measured monetarily because the misuse of the SMA Patient Data would, and does, put SMA "at a competitive disadvantage that a legal remedy could not redress." *Bimbo Bakeries U.S.A., Inc. v. Botticella*, 613 F.3d 102, 118 (3d Cir. 2010).  If IMS is not appropriately enjoined, and is instead able to retain complete control over the SMA Patient Data, over which IMS has *no legal rights*, particularly amidst a bitter dispute between IMS and SMA, then SMA faces significant and irreparable harm.  Although it is difficult, if not impossible, to predict the full extent of SMA's future loss and damages if IMS is permitted to exploit the SMA Patient

Data, the result for IMS, if allowed to continue with the unlawful conduct alleged in the Verified Complaint, is clear: IMS, Mr. Trivedi, and IPS, and any person or entity acting in concert with them, may succeed in using the SMA Patient Data, perhaps the most valuable of SMA's assets, to extort money from SMA or may destroy or further restrict SMA's access to the data to the point that it is effectively destroyed, causing substantial irreparable and incalculable harm to SMA.

For these reasons, SMA has shown irreparable harm.

## III.   DEFENDANTS WILL SUFFER NO HARM IF THE INJUNCTION IS GRANTED, THUS TILTING THE BALANCE OF THE EQUITIES DECIDEDLY IN SMA'S FAVOR.

While SMA will suffer irreparable harm absent an injunction, IMS has no countervailing equitable interest in continuing to retain custody and control of SMA's property, the SMA Patient Data.  For this reason, the balance of equities favors an injunction.  Insofar as IMS may attempt to argue that it has an interest in retaining leverage that it thinks it requires to compel SMA to pay IMS, IPS, and/or Mr. Trivedi money allegedly owed, such a proposition lacks basis in law.  *See* NVR, 2015 WL 9450831, at *3 (D.N.J. Dec. 23, 2015) (finding the balance of equities "[c]learly . . . favors the [p]laintiff" where the plaintiff demonstrated that defendant "will not be harmed by being forbidden to use information he has no right to use or disclose").

Given that (1) IMS certainly has no legitimate interest in stealing or otherwise misusing the SMA Patient Data, and that (2) the return of the SMA Patient Data will not prejudice IMS's ability to assert claims, at a later time, and in an appropriate forum, against SMA alleging that SMA owes it money for services allegedly rendered, IMS will not be harmed whatsoever by the issuance of the injunction that SMA is seeking.  In the event that IMS is concerned that the migration of the SMA Patient Data will cause it to incur costs, SMA has made clear that it would pay IMS a reasonable migration fee to cover those costs.

For these reasons, the balance of the equities tilts decidedly in SMA's favor.

## IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION.

The public interest clearly favors an injunction here.  *See Marsellis -Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 532-33 (D.N.J. 1999) ("Where a party demonstrates both the likelihood of success on the merits and irreparable injury, 'it almost always will be the case that the public interest will favor' the issuance of an injunction.") (quoting *American Telephone & Telegraph, Co. v. Wimback and Conserve Program, Inc.* 42 F.3d 1421, 1427 (3d Cir. 1994)).  If granted, the relief that SMA is seeking — the return of the SMA Patient Data containing its patients' PHI — advances the public health, safety, and welfare, by ensuring that thousands of people are guaranteed not only continuity of good medical care by SMA and its providers, but also the continued right to access and assess their medical records.

Conversely, IMS's ongoing attempted extortion of SMA, and IMS's ongoing misappropriation of the SMA Patient Data, serve no public interest whatsoever.

## **CONCLUSION**

For all the foregoing reasons, the Court should grant SMA's application for preliminary injunctive relief, together with such other and further relief that the Court deems just and proper.

Respectfully submitted,

**MANDELBAUM SALSBURG, P.C.**
Attorneys for Plaintiff

By:   _____
Christopher G. Salloum, Esq.
Steven W. Teppler, Esq.

DATED:  June 11, 2020
Roseland, New Jersey