**Christopher G. Salloum, Esq.**
**Steven W. Teppler, Esq.**
**MANDELBAUM SALSBURG, P.C.**
**3 Becker Farm Road – Suite 105**
**Roseland, New Jersey 07068**
**Tel. 973-736-4600**
**Fax. 973-736-4670**
**Attorneys for Plaintiff**
  **Salerno Medical Associates, LLP**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SALERNO MEDICAL ASSOCIATES, LLP, <br><br> Plaintiff, <br><br> v. <br><br> INTEGRITY PRACTICE SOLUTIONS, LLC; INTEGRITY MEDICAL SYSTEMS, LLC; CHINTAN TRIVEDI; JOHN DOES 1-10; and ABC CORPORATIONS 1-10, <br><br> Defendants. | Civil Action No. <br> 2:20-cv-07076-JMV-JVC <br><br> Hon. John M. Vazquez, U.S.D.J. <br> Hon. James B. Clark, U.S.M.J. <br><br><br> **AMENDED VERIFIED COMPLAINT** <br> **AND DEMAND FOR TRIAL BY JURY** |

Plaintiff, Salerno Medical Associates, LLP ("**Plaintiff**" or "**SMA**"), with a principal place of business located at 613 Park Avenue, East Orange, New Jersey 07017, by and through its attorneys, Mandelbaum Salsburg, P.C., by way of Amended Verified Complaint against defendants, Integrity Medical Systems, LLC ("**IMS**"), Integrity Practice Solutions, LLC ("**IPS**"), Chintan Trivedi ("**Mr. Trivedi**"), all of whom have a principal address located at 26 Musket Drive, Basking Ridge, New Jersey 07920, John Does 1-10, and ABC Corporations 1-10 (all defendants, collectively, "**Defendants**"), says as follows:

## PRELIMINARY STATEMENT

1.      This case is about an unscrupulous businessman's ongoing attempt to extort money from a medical practice in blatant misappropriation of the medical practice's most precious of trade secrets and proprietary confidential information: its patients' protected health information ("**PHI**").

2.      SMA, a multidisciplinary medical practice, engaged IMS, an entity controlled by Mr. Trivedi, to provide electronic medical recordkeeping ("**EMR**") services.  Over the course of SMA's and IMS's years' long business relationship, SMA has entrusted IMS with the PHI of approximately 16,000 patients.  Such PHI includes, without limitation, patients' names, patients' telephone numbers, patients' addresses, patients' medical records, patients' radiograph images, laboratory results, and other information and documents regarding a patient's health status and the provision of, and payment for, medical services provided to SMA patients  (the "**SMA Patient Data**").

3.      Regrettably, SMA's trust was misplaced.  SMA came to question the propriety of numerous invoices, and the quality of the services, it received from IMS and IPS — an entity SMA engaged in 2016 to provide billing and certain other administrative services and which, like IMS, is owned and/or controlled by co-defendant Mr. Trivedi.  As a result of the billing discrepancies it identified, and the overall poor services provided, SMA determined to discontinue its relationship with IMS, and satisfy its EMR needs elsewhere.

4.      To that end, beginning in the fall of 2019, SMA demanded, repeatedly, that IMS immediately return the SMA Patient Data, but agreed that it would pay an appropriate data migration fee to cover reasonable costs that IMS may incur in connection therewith. Notwithstanding, however, that IMS does not own the SMA Patient Data, IMS refused to return

the same to SMA unless and until SMA first pays, in full, the outstanding balance that SMA allegedly owes to both IMS and IPS, and the validity of which SMA vehemently disputes.

5.    Indeed, IMS, through Mr. Trivedi, has also expressly threatened that, should SMA fail to acquiesce to IMS's extortionary demands for money allegedly due, in addition to continuing to refuse to transfer the SMA Patient Data to SMA, IMS will also terminate or restrict SMA personnel's access to the SMA Patient Data.

6.    Worse still, after the parties' attempts to amicably resolve their dispute failed, IMS has caused SMA to experience daily, significant, and pervasive interruptions in the availability of the SMA Patient Data, severely undermining its ability to treat its patient population and also irreversibly damaging SMA's goodwill by loss of patients and harm to SMA's reputation.

7.    Defendants do not, and cannot, dispute that the SMA Patient Data belongs to SMA; rather, Defendants are attempting to extract money from SMA before returning the SMA Patient Data, money to which Defendants are not entitled.  In any event, the issue whether Defendants are entitled to payment, if any, is irrelevant to this dispute and can be resolved at a later date, in a different forum, and without prejudice to any party.  It is, however, illegal for IMS to deny SMA's request to return the SMA Patient Data or restrict SMA's access thereto unless SMA first acquiesces to Defendants' monetary demands.

8.    By this Action, therefore, SMA seeks — in addition to an award of appropriate damages and costs — an Order enjoining Defendants from restricting and denying SMA's access to the SMA Patient Data that are stored on IMS's servers, and further requiring Defendants to return the SMA Patient Data forthwith.

## JURISDICTION

9.     This Court possesses original jurisdiction pursuant to 28 U.S.C. § 1331 because two of Plaintiff's claims arise under the laws of the United States, specifically, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("**CFAA**"), and the Defend Trade Secrets Act, 18 U.S.C. §§ 1832-1839 ("**DTSA**").  This Court has supplemental jurisdiction over the other claims asserted herein pursuant to 28 U.S.C. § 1367.

10.     Pursuant to 28 U.S.C. § 1391, venue properly lies in this Court because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district and Defendants are subject to personal jurisdiction here.

## GENERAL ALLEGATIONS

### Identification of the Parties

11.     Plaintiff, SMA, is a New Jersey limited liability partnership with a principal place of business at 613 Park Avenue, East Orange, New Jersey 07017.

12.     SMA is a family-run, second generation, multi-disciplinary medical practice that has served East Orange and Newark, New Jersey, federally designated underserved areas, for over fifty (50) years.  Throughout its history, SMA has dedicated itself to providing highest quality medical care and service to those communities most in need, at low or no cost.  Alexander Salerno, M.D. ("**Dr. Salerno**"), a principal of SMA who treats patients on a nearly daily basis, has continued in his family tradition of public service, as evidenced by his service for the U.S. Air Force for over ten (10) years, ultimately reaching the rank of Captain as a General Medical Officer, before joining SMA.  As further testament to SMA's dedication to public service, during the ongoing COVID-19 public health crisis, as documented in a recent June 3, 2020 YouTube  video published by Al Jazeera English available at https://www.youtube.com/watch?v=ono1q061mcM,

SMA has generously expended its own funds to offer drive-by COVID-19 testing for all, notwithstanding ability to pay.

13.     To date, SMA has administered COVID-19 tests to approximately 10,000 patients, including nucleic acid amplification nasal swab tests to detect acute infections of SARS-CoV-2, the virus that causes COVID-19, and SARS-CoV-2 Antibody IgG and IgM tests.  SMA is currently testing between 400 and 800 patients on a daily basis.  To accommodate the influx of patients and to comply with NJ's social distancing guidelines, SMA has been also providing testing services using mobile facilities and tents.

14.     Defendant, Mr. Trivedi, is an individual who resides at 26 Musket Drive, Basking Ridge, New Jersey 07920.

15.     Mr. Trivedi is a member and the managing partner of co-defendants IMS and IPS.

16.     Defendant, IMS, is a New Jersey limited liability company with a principal place of business located at Mr. Trivedi's residential address, 26 Musket Drive, Basking Ridge, New Jersey 07920.

17.     Upon information and belief, IMS is a "value added reseller" of EMR software owned by Meditab Software, Inc. ("**Meditab**")."   In that capacity, IMS provides installation, project management, training, implementation, and support services to its clients who, like SMA, utilize Meditab's EMR software through Meditab licenses purchased from IMS.

18.     Upon information and belief, IMS is also a Meditab "Authorized Hosting Partner." In that capacity, IMS hosts its clients' data (almost all of which contain patient PHI) on its servers, which, upon information and belief, are located in the State of New York.

19.     Upon information and belief, IMS provides EMR services to other New Jersey medical providers.

20.     Defendant, IPS, is a New Jersey limited liability company with a principal place of business located at Mr. Trivedi's residential address, 26 Musket Drive, Basking Ridge, New Jersey 07920.

21.     Upon information and belief, IPS is certified by the Commissioner of the New Jersey Department of Banking and Insurance as a third-party billing service, an entity that, according to New Jersey law, "is paid by a health care provider to process claims or claims payments on behalf of the health care provider." N.J.S.A. 17B:27B-1.

22.     Upon information and belief, John Does 1-10 are other individuals whose names and addresses are presently unknown, and who conspired with Defendants to cause SMA the harm alleged herein.

23.     Upon information and belief, ABC Corporations 1-10 are other legal entities, the names and addresses of which are presently unknown, that are owned or controlled, in whole or in part, by Mr. Trivedi, IPS, and/or IMS.

**SMA Retains IMS To Provide EMR Services**

24.     In 2014, SMA entered into an agreement with IMS pursuant to which IMS agreed to provide EMR-related services to SMA (the "**EMR Agreement**").

25.     Specifically, under the EMR Agreement, IMS provides installation, project management, training, implementation, and support services to SMA in connection with the Meditab EMR software that IMS licenses to SMA, and, upon information and belief, to other medical practices.

26.     In addition, the EMR Agreement also requires IMS to assume the responsibility for hosting the SMA Patient Data on its New York-based servers.

27.     Under the terms of the EMR Agreement, IMS agreed that it would ensure that the SMA Patient Data would be available to SMA, on demand, 24 hours a day, 7 days a week, with only limited, off-hour, interruptions for routine maintenance.

28.     SMA, during the course of treating SMA's patients and through its medical providers and staff, inputs the SMA Patient Data into the Meditab EMR software licensed to SMA through IMS. The SMA Patient Data is simultaneously uploaded onto IMS's servers consistent with the EMR Agreement.

29.     At all relevant times, SMA was, and remains, the sole owner of the SMA Patient Data.

30.     At no point in time did SMA transfer ownership, in whole or in part, of the SMA Patient Data to IMS.

31.     At no point in time did SMA agree that its access to, or ability to retrieve a complete copy of, the SMA Patient Data would be contingent upon SMA's satisfaction of any claim for payment that IMS, IPS, or Mr. Trivedi would make.

32.     Throughout the course of SMA's and IMS's business relationship, SMA and its providers entrusted IMS with the safeguarding of more than 16,000 of SMA's patients' PHI.

33.     In order to safeguard the confidentiality and privacy of its patients' PHI contained in the SMA Patient Data, SMA ensures that only select clinical and administrative SMA personnel possess the ability to access the SMA Patient Data using the Meditab EMR software licensed to SMA through IMS.

34.     In addition, as a precondition to accessing the SMA Patient Data, SMA requires its personnel to undergo appropriate privacy training.

35.     Throughout the duration of the EMR Agreement, SMA remitted $285,515.31 to IMS as payment in full for the aforesaid EMR-related services.  (*See* Declaration of Matthew Rehm ("**Rehm Decl.**"), at ¶¶ 9-10.)

36.     During approximately the same period of time, SMA remitted $427,786.00 to IPS for various services rendered pursuant to SMA's separate agreement with IPS.  (*See* Rehm. Decl., at ¶ 11.)

**SMA Determines to End
Its Relationship with Mr. Trivedi**

37.     At the end of 2019, SMA became — and, upon information and belief, Mr. Trivedi came to realize that SMA had become — dissatisfied with IMS's and IPS's services and business dealings with SMA (particularly, but not exclusively, with their billing practices), causing SMA to seek to satisfy its EMR management needs elsewhere.

38.     As a non-limiting example of one of the bases for SMA's desire to sever its ties with IMS, SMA discovered evidence that IMS had been billing SMA in a manner inconsistent with the terms of the EMR Agreement.

39.     In particular, and again without limitation, IMS fabricated the existence of past-due invoices dating between 2014 and 2015, and presented such alleged past-due invoices to SMA, claiming SMA still owed it money for services provided, although payment for such services had been made many years prior.

40.     IMS's own history of billing, together with SMA's conclusive documentary evidence that monies owed to IMS were in fact, paid to IMS, reveal the glaring and shameless extent of such fabrication:

        a.      By way of a June 28, 2018 email sent to SMA, Mr. Raghav, an individual employed by Mr. Trivedi, sent SMA a Microsoft Excel spreadsheet documenting the outstanding

balance allegedly owed to IMS by SMA for EMR services as of June 28, 2018.  That document revealed no balance outstanding for services IMS provided in the years 2014 and 2015.  (*See* Rehm Decl., at ¶ 7.)

b.     Yet, years later, and months into the dispute between the parties described herein, IMS, again through an email sent by Mr. Raghav, claimed that SMA owed IMS $87,572.19, most of which was alleged to have been for EMR services IMS allegedly provided from January 2014 through December 2015.  (*See* Declaration of Luz Capcha ("**Capcha Decl.**"), at ¶ 8.)

c.     In that same email, IMS also acknowledged that, throughout the duration of the parties' relationship, IMS invoiced SMA in the total amount of $262,619.66.  (*Id.*)

d.     As noted previously, however, SMA had already paid IMS the aggregate amount of $285,515.31 — $22,895.65 *more* than the total amount that IMS represented had been invoiced to SMA.

e.     As such, not only did SMA not have an outstanding balance for EMR services provided in 2014 and 2015, IMS actually owed, and still owes, SMA a refund in the amount of at least $22,895.65.

41.     The aforesaid fraudulent or misleading accounting practices, together with, among other things, IMS's failure to provide the quality customer services that SMA expected from its EMR provider, caused SMA to determine to end its relationship with IMS.

42.     In late 2019, SMA affirmatively demanded that IMS return the SMA Patient Data. (*See* Capcha Decl., at ¶ 4.)

43.     In so doing, SMA made clear that IMS's scope of authority with respect to the SMA Patient Data became limited to the facilitation of the migration of the SMA Patient Data back to SMA.

44.     SMA agreed to pay a reasonable migration fee to cover any costs that IMS might incur in connection with said data migration.

### IMS Holds Hostage the SMA Patient Data
### and Impairs SMA's Access to the Same

45.     Upon information and belief, however, to avoid losing a valuable account like SMA's — which had generated for Mr. Trivedi $714,301.31 in revenue in an approximately five-year-long period — Mr. Trivedi resorted to the only leverage he has over SMA: the SMA Patient Data.

46.     Mr. Trivedi refused to cause the return the SMA Patient Data to SMA unless and until SMA pays, in full, the fraudulent amounts that IMS falsely claims SMA still owes to IMS, together with amounts allegedly owed to Mr. Trivedi's other entity, IPS.

47.     Despite repeated subsequent demands to Mr. Trivedi, IMS and Mr. Trivedi have refused to return to SMA its property, effectively holding hostage SMA, and, more importantly, the PHI for SMA's approximately 16,000 patients, in return for payment of ransom.

48.     Mr. Trivedi and IMS have failed to return the SMA Patient Data notwithstanding receiving assurances from SMA that SMA would, subsequent to the return of the SMA Patient Data, agree to resolve, in good faith, any billing dispute that may exist between SMA and IMS and IPS in an appropriate forum.

49.     By an October 14, 2019 telephone conversation with SMA's Practice Development Manager, Ms. Darlene Serrano Reiter, Mr. Trivedi, on his own behalf and on behalf of IMS and IPS, affirmatively threatened to "dump" SMA from IMS's servers if SMA refuses to pay the amounts allegedly owed to IMS and IPS  ("**Mr. Trivedi's Threat**").  (*See* Declaration of Darlene Serrano Reiter ("**Reiter Decl.**"), at ¶ 6.)

50.     By letter dated May 19, 2020, Mr. Trivedi's, IMS's, and IPS's attorney, Dan Frier, Esq., of Frier Levitt, LLP, affirmatively stated to SMA's counsel that the SMA Patient Data would be returned to SMA only on the condition that SMA pay the amounts allegedly owed to IMS and IPS (the "**FL Communication**," with Mr. Trivedi's Threat, collectively, the "**Extortionate Communications**").

51.     In the approximate two-week period of time immediately preceding the initiation of this lawsuit, after it became evident to all parties, despite SMA's good-faith attempts to settle, that this dispute would not resolve short of litigation, SMA's access to the SMA Patient Data has been substantially disrupted in that certain SMA users, at random,  are kicked off of, and lose the ability to login to, the Meditab software that is licensed to SMA through IMS (the "**Recent Impairment to SMA's Patient Data**"), thereby losing the capacity to access crucial patient PHI necessary to treat patients and also losing the capacity to update said patients' medical records. *See* Capcha Decl., at ¶11.

52.     These periods of disruption last, on average, between twenty (20) to ninety (90) minutes, and occur during SMA's regular business hours when patients are being treated.  When these incidents occur, an error message pops up on the SMA user's computer that says: "The remote computer has ended the connection."  *See* Capcha Decl., at ¶11.  A screenshot of this error message appears below:



*See* Supplemental Declaration of Luz Capcha ("**Suppl. Capcha Decl.**"), at ¶ 3.

53.     The Recent Impairment to SMA's Patient Data has resulted in, at any single point in time during SMA's regular business hours, approximately 30-50 of SMA's users being rendered incapable of logging into the Meditab EMR software that SMA licenses through IMS and accessing the SMA Patient Data housed on IMS's servers. *See* Capcha Decl., at ¶12.

54.     Upon information and belief, IMS, through Mr. Trivedi, is purposefully causing the Recent Impairment to SMA's Patient Data.

55.     When SMA raised the issue of the Recent Impairment to SMA's Patient Data to IMS, IMS responded with delay and obfuscation by requesting that SMA provide IMS with additional burdensome details that IMS had never before required to resolve any issues that may have previously emerged regarding the SMA Patient Data. *See* Capcha Decl., at ¶ 13

56.     As recently as the day before the initiation of the above-captioned action, SMA, through an email sent to Mr. Trivedi by Ms. Luz Capcha of SMA, again made clear to IMS that IMS was engaged in delay with respect to the Recent Impairment to SMA's Patient Data, and repeated SMA's demand that the SMA Patient Data be immediately returned.  In her email, Ms. Capcha stated as follows:

> If IMS had complied with SMA's demand, first made at the end of 2019, that IMS immediately return to SMA our patient data, which is SMA's property, we would not be in this position right now.  In the past, whenever we had connectivity issues (although such issues were never as significant and pervasive as they have become since the emergence of this dispute between us), you never requested that we first clear the kinds of obstacles that you are now creating with the obvious retaliatory purpose of delaying us and frustrating the care that SMA is providing to our patients.
>
> Please immediately transfer our data to us.  It is wrong for you and IMS to continue to hold the same hostage.  Please be reminded that

> IMS no longer possesses the authority to continue to use SMA's data as it had been prior to our data transfer demand.
>
> In the meantime, please fix the issues I've identified so that we can treat our patients until the data migration is complete. I believe that I have been specific enough with respect to the issues we are experiencing. If you have any questions, please don't hesitate to call me at any time.

Capcha Decl., at ¶ 13.

57.    In his response to Ms. Capcha's email, Mr. Trivedi ignored SMA's demand for the return of the SMA Patient Data, disregarded the significance of the consistent and pervasive disruptions, described above, that SMA has been experiencing for the past two weeks, and denied that the SMA Patient Data were being held hostage because, in his words, "SMA always has and continues to have access to the EMR software/platform and the data on it." Capcha Decl., at ¶ 14. A copy of Ms. Capcha's and Mr. Trivedi's email chain is attached as Exhibit A to the Suppl. Capcha Decl.[1]

### After SMA Initiates This Lawsuit, the Connectivity Disruptions Accelerate to the Continued Detriment of SMA's Patients, and Mr. Trivedi's Bad Faith Conduct and Ongoing Attempted Extortion of SMA Continue Unabated

58.    On June 10, 2020, SMA initiated the above-captioned matter by filing a Verified Complaint with the supporting declarations of Matthew Rehm, Darlene Serrano, and Luz Capcha and the exhibits annexed thereto.

59.    On June 11, 2020, SMA filed a Motion for a Preliminary Injunction in this matter.

60.    Notwithstanding the initiation of this lawsuit, the Recent Impairment to SMA's Patient Data has not stopped, and, in fact, has worsened.

---

[1] Plaintiff refers the Court's attention that in that communication, Mr. Trivedi uses the term "access" rather than "ownership" or "custody".

61.     The Recent Impairment to SMA's Patient Data now includes, without limitation and in addition to the intolerable disruptions noted above, the following:

a.     At times, the entire IMS system is down and inaccessible to anyone at SMA. Indeed, for example, as recently as Monday, June 22, 2020, the entire system was down for half a day, while patients are being treated, and an error message appeared strongly suggesting that IMS either purposefully cut SMA off or that IMS's servers were not functioning at the time.   The following is a screenshot of the error message that appeared:



Declaration of Vincent Zafonte ("**Zafonte Decl.**"), at ¶ 6.

b.      SMA staff and practitioners, including Dr. Salerno, are unable to access laboratory test results, including COVID-19 test results, directly through the IMS system, and are forced to go to the laboratory's website to retrieve the results, at a great expense of time,  causing in turn delays to SMA's patients' diagnoses and treatment.

c.     The IMS EMR system now slows down so frequently and to such an extent that SMA is unable to check in and check out patients in a timely fashion at the beginning and conclusion of patient appointments.

d.     As a result, most patients' visits are needlessly prolonged, which has a ripple effect delaying the start time of appointments for other patients whom SMA practitioners are also scheduled to see on the same day.  Indeed, SMA's patients' wait times often now exceed two (2) hours as a result of the Recent Impairment to SMA's Patient Data.

e.      As a major portion of SMA's services are now being rendered in the field, through mobile facilities and tents, patients are forced to wait prolonged periods in extreme heat and without any shade from the sun; many patients find this intolerable and end up not waiting for their appointment.  Given the nature of SMA's patient population (largely, seriously ill, elderly, indigent, and from other medically underserved communities), a delay in the rendering of care to SMA's patients threatens serious injury to their health.  In light of the chronic issues afflicting the IMS system, a patient who is not timely treated may suffer serious adverse health consequences, including death, and a patient who is not timely diagnosed with COVID-19 may not timely learn of their disease, not receive timely treatment and go on to infect others, all because SMA is not able to timely treat such patient due to the dysfunctional IMS system.  If SMA is able to obtain its data from IMS, it would be in the position of preventing serious harm to its patients.

62.      The aforesaid interruptions have profoundly affected SMA's ability to care for its patients, causing profound and irreparable harm to the goodwill that SMA has generated with its patients over decades and also, now, with the various local governmental and non-profit entities that SMA has partnered with to provide COVID-19 testing at no or reduced cost to medically underserved populations, including, without limitation, the governments of Essex County, Newark, Belleville, East Orange, Plainfield, and Maplewood New Jersey, and PSE&G.

63.      Prior to the emergence of a dispute between SMA and IMS (and the other co-defendants in this action), SMA did not experience nearly as numerous, pervasive, and significant complaints regarding problems with IMS's EMR services and systems and the SMA Patient Data contained thereon.  Zafonte Decl., at ¶ 5.

64.      Recently, over the past month or so, SMA's IT department has received numerous complaints and requests for assistance from dozens of SMA staff members, both administrative

and professional, complaining, among other things, that they are no longer able to print anything from the IMS system, that they are unable to view patient laboratory and other patient test results, that the IMS system is down or otherwise inaccessible, and that the IMS system is slow and unresponsive. Zafonte Decl., at ¶ 5.

65.     Rather than returning the SMA Patient Data to SMA, or, at the very least, trying, in good faith, to fix the severe connectivity problems that SMA has been experiencing since attempts to amicably resolve Mr. Trivedi's and SMA's dispute failed, IMS, through Mr. Trivedi, has instead — and in a transparent attempt to convey a false appearance of being helpful — engaged in conduct that serves only to perpetuate the harm that SMA continues to suffer and to force SMA to submit to Mr. Trivedi's extortionary demands.

66.     Such conduct includes the fabrication of a requirement that IMS be provided with additional information that is, in fact, unnecessary, and further includes IMS's baseless and unfounded attempts to cast blame on SMA for connectivity issues that SMA had never experienced (at least to the pervasive extent that it is currently experiencing them) before the parties' settlement discussions failed. *See generally*, *e.g.*, Zafonte Decl.

67.     By way of example, in an email dated June 23, 2020, IMS, through its counsel, Jason Silberberg, Esq., advised SMA's counsel of IMS's purported findings of an alleged "preliminary review" of the various connectivity issues that SMA has recently been experiencing and which have been brought to IMS's attention. Zafonte Decl., at ¶ 8.

68.     In that email, IMS attempts to cast blame upon SMA for the recent disruptions in service that SMA has experienced, and, in an attempt to give the appearance of being helpful, requests additional information from SMA, claiming such information to be necessary to determine whether there is evidence of connectivity issues. Specifically, IMS demands that it must

"review specific session logs from the computers that have experienced the connectivity issues alleged" as well as the "same session logs from those computers that did not experience any of the alleged connectivity issues," and, in connection with that request, provides directions for SMA "to follow to identify and produce the logs in question" ("**Mr. Silberberg's First Request**"). Zafonte Decl., at ¶ 9.

69.     Contrary to that email's insinuation, however, SMA's internet connection, at all locations, is more than sufficient to address all of SMA's internet connection needs.  Zafonte Decl., at ¶ 10.

70.     Moreover, the "session logs" requested in Mr. Silberberg's First Request will not, in fact, provide IMS with any useful information that it will be able to utilize to address the connectivity issues that SMA has recently been experiencing in connection with IMS's system. Such logs are cryptic, and do not actually reveal what has happened beyond repeating the error messages that already appeared on the computer following the connectivity issue.  These error messages are routinely provided by SMA to IMS whenever SMA brings to IMS's attention various connectivity issues.  And, besides, IMS has the capability of determining in-house, as IMS has done before, the origin of the problems.  Zafonte Decl., at ¶ 12.

71.     Indeed, IMS's (unnecessary) request to review all the event logs on devices having an issue would require an inordinate amount of time from SMA's small IT staff.  Given the nature of IMS's unnecessary requests, SMA's IT Manager, Vincent Zafonte, estimates that it would take one SMA IT staff member (and there are only two), dedicated *exclusively* to gathering the unnecessary information that IMS is now requesting, approximately one full work week to complete IMS's unnecessarily-requested tasks.  Zafonte Decl., at ¶ 14. In other words, devoting

such resources would be both duplicative as well as burdensome and would only further impair the efficient provision of SMA's health care services to its clients.

72.     After IMS's counsel responded to Mr. Silberberg's First Request, Mr. Silberberg responded with a purported alternative to the above-described unnecessary request by requesting that SMA provide additional allegedly "very simple info" that allegedly "could go a long way in helping us verify/address the issue." Specifically, Mr. Silberberg asked that SMA please "advise when the error messages were received (even roughly) and which user received them" ("**Mr. Silberberg's Second Request**"). Zafonte Decl., at ¶ 15.

73.     Like Mr. Silberberg's First Request, Mr. Silberberg's Second Request, too, is unnecessary, burdensome, and designed only to obfuscate and delay SMA. The only way to provide the allegedly "very simple info" that Mr. Silberberg's Second Request is seeking would be to gather the event logs that, as indicated earlier, would take one of SMA's two IT staffers, dedicated exclusively to this task, approximately one full work week to complete. Mr. Silberberg's Second Request for allegedly "very simple info" is nothing more than a restatement of the same request he had made in his initial email. And, for the same reasons that Mr. Silberberg's First Request is unduly burdensome, so, too, is Mr. Silberberg's Second Request. In truth, Mr. Silberberg's First Request and Mr. Silberberg's Second Request are one and the same. Zafonte Decl., at ¶ 16.

74.     In any event, however, whenever error messages appear, SMA routinely telephones IMS to seek assistance and in so doing, identifies and explains over the phone the nature of the problem. Zafonte Decl., at ¶ 17.

75.     There is nothing on SMA's end that could explain what has happened and what is causing the severe connectivity issues that SMA has been experiencing with IMS's system. All

the information that IMS needs to evaluate, and correct, the issues SMA has been experiencing is already in IMS's hands.  Zafonte Decl., at ¶ 18.

76.     In addition to continuing to refuse to return to SMA its property, and fabricating the need for unnecessary information, Mr. Trivedi, subsequent to the initiation of this lawsuit, also continued to engage SMA in bad faith.

a.     For example, by email dated June 24, 2020 sent at 3:04 p.m., Mr. Trivedi's counsel, Jason Silberg, Esq., claimed that, insofar as the numbers of SMA users of IMS's system exceed an allegedly previously agreed-upon number of users, then the allegedly "necessary modifications/increased usage will significantly increase the quantum of [Mr. Trivedi's alleged] damages going forward."  In so doing, and further underscoring his ongoing lack of good faith, Mr. Trivedi tacitly admits that he is purposefully failing to mitigate the alleged damages that his refusal to return the SMA Patient Data to SMA is allegedly causing him to sustain, and which he apparently intends to attempt to recover from SMA.  To avoid these alleged damages, all Mr. Trivedi needs to do is return the SMA property that he is currently holding hostage, and, thereafter, Mr. Trivedi could commence his own proceeding against SMA, which SMA would vigorously defend. Attached hereto as **Exhibit A** is a copy of Mr. Silberg's June 24, 2020 email sent at 3:04 p.m.

77.     Unless the Court orders the SMA Patient Data to be returned to its owner, SMA will be effectively forced (until, at the very earliest, Mr. Trivedi's dispute with SMA is resolved, which could take years) into the Catch-22 choice of either submitting to Mr. Trivedi's extortionate demands, or to continue to do business with Mr. Trivedi, a vendor in whom SMA has reasonably lost faith and cannot (or will not) provide the services that he was contracted to perform in a competent and adequate manner.  As a result, not only will SMA continue to suffer irreparable

harm, but so, too, will the general public, whose medical care and treatment, provided by SMA, would otherwise be given in a timely manner commensurate with their medical needs.

78.     Moreover, if Mr. Trivedi is allowed to continue to retain custody of SMA's property without SMA's authorization during the pendency of Mr. Trivedi's dispute with SMA, then Mr. Trivedi will be in a position to continue to place SMA at a competitive disadvantage (unless, of course, SMA submits to Mr. Trivedi's extortion) that a legal remedy will not redress.  For example, in addition to the loss of goodwill and the damage to SMA's reputation among the community it serves, Mr. Trivedi will be able, with respect to new practitioners that SMA may employ or otherwise engage in the near future, to deny SMA the ability to grant those new practitioners access to the SMA Patient Data, effectively forcing SMA to limit its ability to expand its workforce and its business endeavors at a time when the public can ill-afford to suffer a loss or limitation of the nature of the services that SMA provides its community.

## COUNT ONE
### (*Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030*)

79.     Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

80.     The CFAA, in pertinent part, exposes to civil liability "[w]ho[m]ever . . . with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any . . . threat to cause damage to a protected computer . . . or . . . demand or request for money . . .  in relation to damage to a protected computer, where such damage was caused to facilitate the extortion."  18 U.S.C. § 1030(a)(7)(A) & (C).

81.     Specifically, the CFAA provides that "[a]ny person who suffers damage or loss by reason of a violation of [the CFAA] may maintain a civil action against the violator to obtain compensatory damages and injunctive or other equitable relief."  18 U.S.C. § 1030(g).

82.     The CFAA defines damage to mean "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(7).

83.     IMS's servers on which the SMA Patient Data are housed are protected computers within the meaning of 18 U.S.C. § 1030(e)(2).

84.     Mr. Trivedi's Threat is a communication transmitted in interstate or foreign commerce within the meaning of 18 U.S.C. § 1030(a)(7).

85.     The FL Communication is a communication transmitted in interstate or foreign commerce within the meaning of 18 U.S.C. § 1030(a)(7).

86.     Mr. Trivedi's Threat is a communication that contained a threat to cause damage to a protected computer within the meaning of 18 U.S.C. § 1030(a)(7)(A).

87.     The FL Communication constitutes a "demand or request for money in relation to damage to a protected computer" within the meaning of 18 U.S.C. § 1030(a)(7)(C).

88.     The Recent Impairment to SMA's Patient Data has damaged IMS's servers by impairing the availability and integrity of the SMA Patient Data housed thereon.

89.     By the Extortionate Communications, as defined above, IMS and Mr. Trivedi, with the intent to extort money from SMA, communicated, in interstate commerce, to SMA a demand for money in relation to damage to a protected computer, *i.e.*, the threatened impairment to the integrity or availability of the SMA Patient Data housed on IMS's servers.

90.     As contemplated by 18 U.S.C. § 1030(g), the CFAA violations alleged herein "involve" the "modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals," *i.e.*, the approximately 16,000 patients whose PHI is contained in the SMA Patient Data.

91.     As contemplated by 18 U.S.C. § 1030(g), the CFAA violations alleged herein also "involve" a "threat to public health or safety" in that, if such CFAA violations are not adequately remedied, then the safety and privacy of the SMA Patient Data — belonging to more than 16,000 patients in Northern New Jersey, most of whom are from medically underserved areas in Essex County — will be compromised.

92.     By reason of the above-alleged acts and misconduct of Defendants, SMA has been damaged, and will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult, if not impossible, to ascertain, and SMA will be without adequate remedy at law.

93.     By virtue of the foregoing, SMA has been damaged, and, in addition to an appropriate award of damages and other equitable relief, SMA is entitled to an appropriate preliminary and permanent injunction, pursuant to 18 U.S.C. § 1030(g), requiring, among other things, that IMS to return forthwith to SMA the SMA Patient Data.

### COUNT TWO
**(*Violations of the Defend Trade Secrets Act, 18 U.S.C. §§ 1832-1839*)**

94.     Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

95.     SMA is the owner of the SMA Patient Data.

96.     Under the DTSA, Defendants are prohibited from misappropriating SMA's trade secrets.

97.     The SMA Patient Data that SMA entrusted to IMS over the course of their business relationship constitute trade secrets within the meaning of the DTSA.  *See* 18 U.S.C. § 1839(3)

98.     SMA has taken reasonable steps to maintain the secrecy of the SMA Patient Data, including, without limitation, by limiting access to the SMA Patient Data only to appropriate SMA

personnel and to SMA patients and their duly authorized representatives, by requiring SMA personnel to undergo privacy training as a precondition to accessing the SMA Patient Data, and by expending hundreds of thousands of dollars and substantial resources, time, and energy to develop and maintain the SMA Patient Data.

99.     The SMA Patient Data derive independent economic value from not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on SMA over others in the relevant market.

100.    The SMA Patient Data are not known to others and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

101.    The DTSA authorizes "an owner of a trade secret that is misappropriated" to commence a civil action "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

102.    The DTSA defines misappropriation to include, among other things, "use of a trade secret of another without express or implied consent by a person who . . . at the time of . . . use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to . . . limit the use of the trade secret." *See* 18 U.S.C. § 1839(3).

103.    Whenever SMA uploads SMA Patient Data to IMS's servers, SMA provides IMS with a limited scope of authorization to use that data consistent with the terms of the EMR Agreement.

104.    Whenever SMA uploads SMA Patient Data to IMS's servers, IMS acquires said SMA Patient Data with the understanding that the same may be used by IMS only with SMA's affirmative and continued authorization and that SMA is subject to various legal obligations

requiring it to maintain the availability of its data and to produce the same upon appropriate demand.

105.    In other words, IMS acquires the SMA Patient Data under circumstances that imposed upon IMS a duty to limit the use of the SMA Patient Data consistent with the scope of the authorization conferred upon IMS by SMA.

106.    By demanding the immediate return of the SMA Patient Data, SMA revoked and terminated IMS's authorization to use the same, as described above.

107.    IMS's and Mr. Trivedi's refusal to return SMA Patient Data to SMA, and their continuing storage, processing, and interruption and/or limitation of SMA's access to SMA Patient Data constitutes the use of SMA's trade secrets without express or implied consent by SMA.

108.    By virtue of the foregoing, IMS has misappropriated the SMA Patient Data.

109.    SMA has never given IPS authorization to access, use, or limit SMA's access to the SMA Patient Data.

110.    By attempting to leverage the SMA Patient Data, to which it was never given authorization to access or use, in any way, and in order to extract payment from SMA for monies allegedly due, IPS has misappropriated the SMA Patient Data.

111.    The aforesaid current and ongoing misappropriation of the SMA Patient Data is willful, reckless, and malicious.  IMS, IPS, and/or Mr. Trivedi each know of the confidentiality, ownership, and use restrictions on the SMA Patient Data.

112.    The aforesaid misappropriation of the SMA Patient Data comprises acts, including, without limitation, IMS's, IPS's, and/or Mr. Trivedi's misuse of the SMA Patient Data, on or after DTSA's date of enactment, May 11, 2016.

113.     IMS's and/or IPS's aforesaid misappropriation of the SMA Patient Data has damaged SMA, and SMA, pursuant to 18 U.S.C. §1836(b)(3)(A), is entitled to an appropriate preliminary and permanent injunction requiring IMS to return to SMA the SMA Patient Data forthwith and, until that process is complete, to provide SMA with unfettered access to the SMA Patient Data

### COUNT THREE
***(Violations of the New Jersey Trade Secrets Act, N.J.S.A. §§ 56:15-1 to -9)***

114.     Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

115.     Under the New Jersey Trade Secrets Act ("**NJSTA**"), Defendants are prohibited from misappropriating SMA trade secrets.

116.     The SMA Patient Data that SMA entrusted to IMS over the course of their business relationship constitute trade secrets within the meaning of the NJTSA.  *See* N.J.S.A. 56:15-2.

117.     Whenever SMA uploads SMA Patient Data to IMS's servers, SMA provides IMS with a limited scope of authorization to use that data consistent with the terms of the EMR Agreement.

118.     Whenever SMA uploads SMA Patient Data to IMS's servers, IMS acquires said SMA Patient Data with the understanding that the same may be used only by IMS with SMA's affirmative and continued authorization, and that SMA is subject to various legal obligations requiring it to maintain the availability of its data and to produce the same upon appropriate demand.

119.     In other words, IMS acquires the SMA Patient Data under circumstances that imposed upon IMS a duty to limit the use of the SMA Patient Data consistent with the scope of the authorization conferred upon IMS by SMA.

120.    By demanding the immediate return of the SMA Patient Data, SMA revoked and terminated IMS's authorization to use the same, as described above.

121.    IMS's and Mr. Trivedi's refusal to return to SMA the SMA Patient Data constitutes the use of SMA's trade secrets without express or implied consent by SMA.

122.    By virtue of the foregoing, IMS has misappropriated the SMA Patient Data.

123.    SMA has never given IPS authorization to access or use, in any capacity, the SMA Patient Data.

124.    By attempting to leverage the SMA Patient Data, to which IPS was never given authorization to access or use, in any way, in order to extract payment from SMA for monies allegedly due, IPS has misappropriated the SMA Patient Data.

125.    The aforesaid current and ongoing misappropriation of the SMA Patient Data is willful, reckless, and malicious.  IMS, IPS, and/or Mr. Trivedi each know of the confidentiality, ownership, and use restrictions on the SMA Patient Data.

126.    The aforesaid misappropriation of the SMA Patient Data has damaged SMA, and in addition to an appropriate award of damages and costs, pursuant to N.J.S.A. 56:15-3, SMA is entitled to an appropriate injunction requiring IMS to return to SMA the SMA Patient Data forthwith.

### COUNT FOUR
***(IMS's and IPS's Misappropriation of the SMA Patient Data, New Jersey Common Law)***

127.    Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

128.    Under New Jersey common law, Defendants are prohibited from misappropriating SMA trade secrets and confidential information.

129.    The SMA Patient Data that SMA entrusted to IMS over the course of their business relationship constitute trade secrets.

130.    The SMA Patient Data constitute confidential information that IMS knew SMA treated, and expected IMS would similarly treat, as confidential.

131.    Whenever SMA uploads SMA Patient Data to IMS's servers, SMA provides IMS with a limited scope of authorization to use that data consistent with the terms of the EMR Agreement.

132.    Whenever SMA uploads SMA Patient Data to IMS's servers, IMS acquires said SMA Patient Data with the understanding that the same may be used only by IMS with SMA's affirmative and continued authorization, and that SMA is subject to various legal obligations requiring it to maintain the availability of its data and to produce the same upon appropriate demand.

133.    In other words, IMS acquires the SMA Patient Data under circumstances that imposed upon IMS a duty to limit the use of the SMA Patient Data consistent with the scope of the authorization conferred upon IMS by SMA.

134.    By demanding the immediate return of the SMA Patient Data, SMA revoked IMS's authorization to use the same, as described above.

135.    IMS's and Mr. Trivedi's refusal to return to SMA the SMA Patient Data constitutes the use of SMA's trade secrets without express or implied consent by SMA.

136.    By virtue of the foregoing, IMS has misappropriated the SMA Patient Data.

137.    SMA has never given IPS authorization to access, use, in any capacity, or limit SMA's use,  of the SMA Patient Data.

138.    By attempting to leverage the SMA Patient Data, to which IPS was never given authorization to access or use, in any way, and in order to extract payment from SMA for monies allegedly due, IPS has misappropriated the SMA Patient Data.

139.    The aforesaid current and ongoing misappropriation of the SMA Patient Data is willful, reckless, and malicious.  IMS, IPS, and/or Mr. Trivedi each know of the confidentiality, ownership, and use restrictions on the SMA Patient Data.

140.    The aforesaid misappropriation of the SMA Patient Data has damaged SMA, and in addition to an appropriate award of damages and costs, pursuant to N.J.S.A. 56:15-3, SMA is entitled to an appropriate injunction requiring IMS to return to SMA the SMA Patient Data forthwith.

## <u>COUNT FIVE</u>
### (*Violations of the New Jersey Computer Related Offenses Act, N.J.S.A. §§ 2A:38A-1 to -6*)

141.    Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

142.    The New Jersey Computer Related Offenses Act ("**CROA**"), N.J.S.A. §§ 2A:38A-1, *et seq.*, exposes to civil liability whomever causes a "person or enterprise damage[] in business or property" as a result of certain statutorily-enumerated actions, including, without limitation, "[t]he purposeful or knowing, and unauthorized . . . taking . . . . . . [of] any data[.]" N.J.S.A. 2A:38A-3.

143.    The SMA Patient Data constitute "data" within the meaning of N.J.S.A. 2A:38A-3.

144.    By refusing to accede to SMA's lawful request to return the SMA Patient Data to SMA, IMS has purposefully taken, without SMA's authorization, the SMA Patient Data in violation of the CROA.

145.    As a result thereof, SMA has been damaged and is entitled to damages, costs, and, pursuant to N.J.S.A. § 2A:38A-5, an appropriate injunction requiring IMS to return forthwith to SMA the SMA Patient Data.

## COUNT SIX
### (*IMS's Breach of Implied Covenant of Good Faith and Fair Dealing*)

146.    Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

147.    The aforesaid conduct of IMS constitutes breaches of the covenant of good faith and fair dealing implied in the EMR Agreement.

148.    As a direct and proximate result thereof, Plaintiff has suffered, and, if Defendants are not appropriately enjoined, will continue to suffer, substantial damages.

## COUNT SEVEN
### (*IMS's Breach of Fiduciary Duties to SMA, New Jersey Common Law*)

149.    Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

150.    By entering into the EMR Agreement with IMS, SMA placed its trust and confidence in IMS, which, by virtue of accepting responsibility for the SMA Patient Data, assumed a superior position with respect to the custodianship of SMA's most precious trade secrets and proprietary confidential information: its patients' PHI.

151.    By virtue thereof, a fiduciary relationship arose between IMS and SMA with respect to the SMA Patient Data.

152.    IMS, therefore, owes, and continues to owe, fiduciary duties to SMA because, among other reasons, SMA entrusted IMS with the responsibility to maintain and use safely the SMA Patient Data consistent with the scope of authorization provided to IMS by SMA.

153.    By failing to return the SMA Patient Data to SMA upon SMA's demand, IMS has breached its fiduciary duty to SMA.

154.    As a direct and proximate result thereof, Plaintiff has suffered, and, if Defendants are not appropriately enjoined, will continue to suffer, substantial damages.

## COUNT EIGHT
### (*IMS's Breach of Duty of Confidence, New Jersey Common Law*)

155.    Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

156.    IMS owes, and continues to owe, a duty of confidence to SMA because, among other reasons, SMA disclosed SMA's trade secrets (i.e., the SMA Patient Data) to IMS, pursuant to the EMR Agreement, based on IMS's express and implied promises of confidentiality.

157.    IMS breached its duty of confidence to SMA by misappropriating the SMA Patient Data, as described above, including by using the SMA Patient Data without SMA's express or implied consent or otherwise inconsistent with the scope of SMA's consent.

158.    At the time of IMS's improper use, IMS knew or had reason to know that its knowledge of the SMA Patient Data was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the SMA Patient Data in a manner consistent with the scope of SMA's express or implied authorization.

159.    As a direct and proximate result thereof, Plaintiff has suffered, and, if Defendants are not appropriately enjoined, will continue to suffer, substantial damages.

## COUNT NINE
### (*Tortious Interference with Contractual Relationship and Prospective Economic Advantage, New Jersey Common Law*)

160.    Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

161.   SMA has contractual relationships with its patients.

162.   SMA has prospective economic advantage with its patients.

163.   IMS, IPS, and Mr. Trivedi are aware of SMA's contractual relations with its patients and its prospective economic advantage with those patients.

164.   The aforesaid conduct of IMS, IPS, and Mr. Trivedi constitutes, *inter alia*, a tortious interference with SMA's contractual relationships with its patients and with SMA's prospective economic advantage with its patients.

165.   The aforesaid conduct of Defendants was willful, wanton, malicious, and/or in reckless disregard of SMA's rights.

166.   As a direct and proximate result thereof, SMA has suffered, and will continue to suffer, substantial damages.

## COUNT TEN
### (*Unfair Competition – New Jersey Common Law*)

167.   Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

168.   Defendants undertook the aforesaid misappropriation of the SMA Patient Data with knowledge of and disregard for SMA's contractual, statutory, and common law rights, and with the intention of causing harm to SMA and benefiting themselves.

169.   As evidenced by their intent to extract money from SMA, Defendants' misappropriation of the SMA Patient Data was done in bad faith and with malice.

170.   As a direct and proximate result thereof, SMA has suffered, and will continue to suffer, substantial damages, and SMA will be threatened with loss of business expectancies, patients, confidential information, trade secrets, and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court.

171.    In addition, SMA seeks actual, incidental, compensatory, punitive, and consequential damages, along with reasonable attorneys' fees and costs in amounts to be determined at trial.

### COUNT ELEVEN
(*Breach of Contract*)

172.    Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

173.    The EMR Agreement is a valid and enforceable contract between IMS and SMA.

174.    The aforesaid conduct of IMS — including, without limitation, IMS's fraudulent and misleading billing practices and IMS's holding the SMA Patient Data hostage in exchange for payment of ransom — constitutes breaches of the EMR Agreement.

175.    As a direct and proximate result thereof, SMA has been damaged.

### COUNT TWELVE
(*Civil Conspiracy*)

176.    Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

177.    Under New Jersey law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 171 (2005).

178.    IMS, IPS, and Mr. Trivedi agreed with one another, and acted in concert, to harm SMA by depriving SMA of its property, the SMA Patient Data, unless and until SMA pays them amounts allegedly owed to IMS and IPS.

179.     Each defendant intentionally and knowingly took steps in furtherance of their agreement to injure SMA, by among other things, agreeing that IMS and Mr. Trivedi should attempt to extract money from SMA for amounts allegedly owed to IPS by refusing to cause IMS's migration of the SMA Patient Data, which SMA had entrusted to IMS, back to SMA, unless and until SMA acquiesces to the extortionary demands against SMA as alleged herein.

180.     By virtue of the foregoing, IMS, IPS, and Mr. Trivedi are jointly and severally liable for the harm alleged herein to have been committed against SMA.

## COUNT THIRTEEN
(*Veil Piercing – Mr. Trivedi's Personal Liability*)

181.     Plaintiff repeats and realleges the allegations of each preceding paragraph as if the same were set forth verbatim herein.

182.     By virtue of his position as an owner, officer, director, and/or controlling member of IMS and IPS, Mr. Trivedi used IMS and IPS as his alter egos to such an extent that the required separateness of IMS and IPS has ceased to exist due to Mr. Trivedi's misuse of IMS's and IPS's limited liability company ("LLC") form.

183.     Mr. Trivedi operated IMS and IPS not as separate entities, but instead as one, and has misused their LLC structure in an inequitable manner to harm SMA by holding the SMA Patient Data hostage, as alleged herein, unless and until SMA pays *both* IMS and IPS amounts Mr. Trivedi alleges SMA owes both entities.

184.     That Mr. Trivedi used IMS and IPS as his alter egos is evidenced by the following facts, among many others:

(a)     Mr. Trivedi required that all payments for amounts owed to *both* IMS and IPS be sent to his residential address in Basking Ridge, New Jersey;

(b)     Mr. Trivedi employed the same individuals, such as Mr. Raghav, to conduct business on behalf of both IMS and IPS; and

(c)     Mr. Trivedi is comingling the financial affairs of both IMS and IPS to such a great extent that he is using debts allegedly owed to IPS to justify IMS's refusal to return to SMA property (*i.e.*, the SMA Patient Data), that SMA entrusted to IMS in connection with the EMR Agreement.

(d)     IMS, IPS, and Mr. Trivedi have each engaged the same law firm, Frier Levitt, LLP, to represent each of them in connection with the above-captioned matter.

185.    By virtue of the foregoing, the veil is pierced with respect to Mr. Trivedi's interest in IMS and IPS, and Mr. Trivedi is personally liable for any misconduct committed by IMS and/or IPS against SMA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment on all of the above counts of this Verified Complaint against Defendants jointly, severally, and/or in the alternative, as follows:

1.     Declaring and adjudging that (i) the SMA Patient Data belongs to SMA; (ii) IMS is unlawfully retaining the SMA Patient Data in violation of SMA's express grant of authorization in connection therewith; and (iii) the SMA Patient Data must immediately be returned to SMA.

2.     An Order restraining Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from using, disclosing, transferring, or deleting, destroying, manipulating, and/or otherwise altering the SMA Patient Data or  other confidential proprietary information of SMA, and from obtaining any commercial advantage of unjust enrichment from their misappropriation of the SMA Patient Data or other confidential and proprietary information.

3.      An Order preliminarily and permanently requiring IMS to cause the migration of the SMA Patient Data to SMA, or otherwise return the SMA Patient Data to SMA;

4.      Damages, including punitive, consequential, and exemplary damages, as applicable, plus interest;

5.      Reasonable attorneys' fees;

6.      Costs; and

7.      Such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury on all issues so triable.

MANDELBAUM SALSBURG, P.C.
Attorneys for Plaintiff


By:    _____
Christopher G. Salloum, Esq.
Steven W. Teppler, Esq.
3 Becker Farm Road
Roseland, New Jersey 07068
Tel. 973.736-4600
Fax. 973-736-4670
Email: steppler@lawfirm.ms
        csalloum@lawfirm.ms

DATED:   June 26, 2020

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

SALERNO MEDICAL ASSOCIATES, LLP,

               Plaintiff,

      v.

INTEGRITY PRACTICE SOLUTIONS, LLC;
INTEGRITY MEDICAL SYSTEMS, LLC;
CHINTAN TRIVEDI; JOHN DOES 1-10; and
ABC CORPORATIONS 1-10,

               Defendants.

Civil Action No.
2:20-cv-07076-JMV-JVC

Hon. John M. Vazquez, U.S.D.J.
Hon. James B. Clark, U.S.M.J.

**VERIFICATION OF
ALEXANDER SALERNO, M.D.**

I, Alexander Salerno, M.D., of full age, say as follows:

I am a physician licensed to practice medicine and surgery in the State of New Jersey, and I am the majority owner of the plaintiff, Salerno Medical Associates, LLP ("**SMA**"), in the above-captioned action. I have read the annexed Amended Verified Complaint in its entirety, and know the factual contents thereof and the same is true based on my own personal knowledge, except for those matters therein which are stated to be alleged upon information and belief or verified by citation to the declarations of others, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 26, 2020

                                      _____
                                      Alexander Salerno, M.D.

Exhibit A

Friday, June 26, 2020 at 16:51:29 Eastern Daylight Time

| | |
|---|---|
| **Subject:** | RE: SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE SOLUTIONS, LLC, Case No. 2:20-cv-07076-JMV-JBC |
| **Date:** | Wednesday, June 24, 2020 at 3:04:24 PM Eastern Daylight Time |
| **From:** | Jason Silberberg <JSilberberg@frierlevitt.com> |
| **To:** | Christopher G. Salloum <CSalloum@lawfirm.ms>, Steven W. Teppler <steppler@lawfirm.ms> |
| **CC:** | Michelle L. Greenberg <MGreenberg@FrierLevitt.com>, Mohamed H. Nabulsi <MNabulsi@lawfirm.ms> |
| **Attachments:** | image006.png, image007.png, image008.png, image009.jpg, image010.png, image011.png, image012.png |

[EXTERNAL]
Good morning Chris,

We have not received any of the additional information requested of you necessary to make any real sense of the purported screenshots you sent yesterday by email. When I noted to the Judge that screenshots would have been a sensible thing to include in your application as evidence of an actual connectivity issue, and that the absence of that (in addition to any other concrete evidence) was both conspicuous and significant, I did not think you would try to cure the issue by providing us with nothing more than a copy and paste of a context-free pop-up error message, which, quite frankly, can be pulled off of Google images in a matter of seconds.

I presumed you'd send an actual screenshot – meaning, a screengrab of an SMA employee's monitor, reflecting time/date, and the identity of the user that was logged on to the EMR when the error occurred. I'd imagine this information, username and date of error, would be quite simple to collect. Relatedly, we would like to know whether those users for whom you will (hopefully) provide examples were able or unable to immediately log back into the system through the Remote Desktop program and, roughly, how many users in total experience this problem per day. If the problem is pervasive enough and occurring frequently enough ("30-50 of SMA's users being rendered incapable of logging into the Meditab EMR" at "any single time" during "regular business hours") that you've applied for an injunction to address it, it does not really square that it should be so difficult to provide such evidence – and one would think providing us with this information, in addition to the session logs requested, would be of top priority. Not so, evidently. And, to be clear, not providing us with this info makes it very difficult for my client's tech folks to actually work on verifying whether there is a problem and addressing it. Resorting to name-calling and grandiose allegations of sabotage and intrigue as a response, candidly but with respect, is not exactly a productive approach. Moreover, your observation that my client has allegedly "never before" made your client "jump through burdensome obstacles" that begin "all of a sudden . . . after our settlement discussions failed" is an odd one – why would it strike you as suspect that these alleged IT issues that have heretofore (over the last 5-6 years) never occurred might require more specific/comprehensive information to address them?

Here's the bottom line – my client, despite all of the above and the lack of any evidence provided to date, is trying to take your allegations seriously and is putting time and resources into its IT professionals to address them. But they need the info requested to do the work. So kindly provide it.

In the interim, my client has done research into the pop-up error messages and has reviewed user log-in activity in an effort to address the issue, despite having received no additional info from SMA. Note again that their findings cannot be verified given the lack of data from SMA, but the following is an educated guess: The "remote computer has ended the connection" pop-up  is commonly triggered by user-idling, i.e. when a user on a connected computer has not used it (e.g., moved the mouse, typed anything on the

keyboard, etc.) for a period of 30-minutes – this is an automated Remote Desktop security failsafe that is in place and is standard practice in the EMR industry. The other pop-up likely resulted from SMA having more than 160 individual Remote Desktop sessions accessing the servers simultaneously. Given SMA's size in terms of number of providers and the corresponding unique concurrent user-accounts, 160+ employees logging on to the Remote Desktop program simultaneously is extremely suspect and smacks of a potential denial-of-service tactic designed to purposefully crash the system. If, however, you will represent to IMS that SMA does, in fact, have 160+ employees (please provide an exact number with EMR usernames to verify authorized users) who routinely use the EMR system simultaneously, my client, given the current litigation and the Judge's directive, will do what they can to accommodate these numbers – even though it was specifically agreed to that increasing licensee/user numbers is to be decoupled from connectivity issues. Note that because the Parties never reached an agreement for accommodating numbers of this size, the necessary modifications/increased usage will significantly increase the quantum of damages going forward.

Please provide us with the requested session log data, the time and user name associated with a representative sampling of the two pop-up errors that have been occurring, in addition to the maximum number (along with name and location – even if the answer is "work from home" of each user) of user-employees accessing the EMR system during business hours. This will allow us to thoroughly investigate and address the connectivity-related allegations. Thank you.

Very truly yours,

Jason N. Silberberg, Esq.



84 Bloomfield Avenue
Pine Brook, NJ  07058
**direct:  (973) 852-8368**
phone:  (973)618-1660
fax:  (973)618-0650
email:  jsilberberg@frierlevitt.com
web:  https://link.edgepilot.com/s/20909c24/ReyTuK5wYUedxQSS_9NGag?u=http://www.frierlevitt.com/
Follow us on: Linkedin | Twitter | Facebook | Instagram

Frier Levitt COVID-19 Resources

This email and any files transmitted with it are personal confidential and intended solely for the use of the individual or entity to whom they are addressed.  They are also subject to the attorney work product and attorney-client privileges.  If you received this transmission in error, please notify the sender by reply email and delete the message and any attachments.  Thank you.

**From:** Christopher G. Salloum <CSalloum@lawfirm.ms>
**Sent:** Tuesday, June 23, 2020 6:44 PM
**To:** Jason Silberberg <JSilberberg@frierlevitt.com>; Steven W. Teppler <steppler@lawfirm.ms>
**Cc:** Michelle L. Greenberg <MGreenberg@FrierLevitt.com>; Mohamed H. Nabulsi <MNabulsi@lawfirm.ms>
**Subject:** Re: SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE SOLUTIONS, LLC, Case No. 2:20-cv-07076-JMV-JBC



Best,
Chris

**Christopher G. Salloum** | Associate
(973) 607-1267

Mandelbaum Salsburg P.C.
3 Becker Farm Road
Roseland, NJ 07068

**From:** Jason Silberberg <JSilberberg@frierlevitt.com>
**Date:** Tuesday, June 23, 2020 at 6:28 PM
**To:** Christopher Salloum <CSalloum@lawfirm.ms>, Steven Teppler <steppler@lawfirm.ms>
**Cc:** "Michelle L. Greenberg" <MGreenberg@FrierLevitt.com>, "Mohamed H. Nabulsi, Esq." <MNabulsi@lawfirm.ms>
**Subject:** RE: SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE SOLUTIONS, LLC, Case No. 2:20-cv-07076-JMV-JBC

[EXTERNAL]

Very truly yours,

Jason N. Silberberg, Esq.



84 Bloomfield Avenue
Pine Brook, NJ  07058
**direct:  (973) 852-8368**
phone:  (973)618-1660
fax:  (973)618-0650
email:  jsilberberg@frierlevitt.com
web:  https://link.edgepilot.com/s/bd101fa8/iHpbAi0JIEeyqkytKLQWAw?
u=http://www.frierlevitt.com/
Follow us on: Linkedin | Twitter | Facebook | Instagram

Frier Levitt COVID-19 Resources

This email and any files transmitted with it are personal confidential and intended solely
for the use of the individual or entity to whom they are addressed.  They are also subject
to the attorney work product and attorney-client privileges.  If you received this
transmission in error, please notify the sender by reply email and delete the message and
any attachments.  Thank you.

---

**From:** Christopher G. Salloum <CSalloum@lawfirm.ms>
**Sent:** Tuesday, June 23, 2020 6:06 PM
**To:** Jason Silberberg <JSilberberg@frierlevitt.com>; Steven W. Teppler <steppler@lawfirm.ms>
**Cc:** Michelle L. Greenberg <MGreenberg@FrierLevitt.com>; Mohamed H. Nabulsi <MNabulsi@lawfirm.ms>
**Subject:** Re: SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE SOLUTIONS, LLC, Case No. 2:20-cv-
07076-JMV-JBC



**Christopher G. Salloum** | Associate
(973) 607-1267

Mandelbaum Salsburg P.C.
3 Becker Farm Road
Roseland, NJ 07068

**From:** Jason Silberberg <JSilberberg@frierlevitt.com>
**Date:** Tuesday, June 23, 2020 at 6:04 PM
**To:** Steven Teppler <steppler@lawfirm.ms>, Christopher Salloum <CSalloum@lawfirm.ms>
**Cc:** "Michelle L. Greenberg" <MGreenberg@FrierLevitt.com>, "Mohamed H. Nabulsi, Esq."
<MNabulsi@lawfirm.ms>
**Subject:** RE: SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE SOLUTIONS, LLC, Case No.
2:20-cv-07076-JMV-JBC



Very truly yours,

Jason N. Silberberg, Esq.



84 Bloomfield Avenue
Pine Brook, NJ  07058
**direct:  (973) 852-8368**

phone:  (973)618-1660
fax:  (973)618-0650
email:  jsilberberg@frierlevitt.com
web:  https://link.edgepilot.com/s/5e708e8c/KHf45Cj14U_dhEvIkyDegw?
u=http://www.frierlevitt.com/
Follow us on: Linkedin | Twitter | Facebook | Instagram

Frier Levitt COVID-19 Resources


This email and any files transmitted with it are personal confidential and intended solely for the use of the individual or entity to whom they are addressed.  They are also subject to the attorney work product and attorney-client privileges.  If you received this transmission in error, please notify the sender by reply email and delete the message and any attachments.  Thank you.

---

**From:** Steven W. Teppler <steppler@lawfirm.ms>
**Sent:** Tuesday, June 23, 2020 5:45 PM
**To:** Christopher G. Salloum <CSalloum@lawfirm.ms>
**Cc:** Jason Silberberg <JSilberberg@frierlevitt.com>; Michelle L. Greenberg <MGreenberg@FrierLevitt.com>; Mohamed H. Nabulsi <MNabulsi@lawfirm.ms>
**Subject:** Re: SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE SOLUTIONS, LLC, Case No. 2:20-cv-07076-JMV-JBC


Jason and Michelle:

███████████████████████████████████████████████████████████
████████████████████████████████████

Steven


Sent from my iPad

**Steven W. Teppler** | Member
(561) 328-4617
—————————
Mandelbaum Salsburg P.C.
3 Becker Farm Road
Roseland, NJ 07068

> On Jun 23, 2020, at 5:43 PM, Steven W. Teppler <steppler@lawfirm.ms> wrote:
>
> Chris:
>
> ████████████████████████████████████

Sent from my iPad

**Steven W. Teppler | Member**
(561) 328-4617

<SignatureTransparent1_88b5a975-0f50-44ae-b6e7-12dd41b6daa3.png>

Mandelbaum Salsburg P.C.
3 Becker Farm Road
Roseland, NJ 07068

*This email and any attachments are intended solely for the recipient to whom it is addressed. It may also be an attorney-client communication, and as such is privileged and confidential. Any unauthorized review, use, disclosure or copying of this message is strictly prohibited. If you are not the intended recipient or have received this email in error, delete it immediately and notify the sender.*

> On Jun 23, 2020, at 5:41 PM, Christopher G. Salloum <csalloum@lawfirm.ms> wrote:
>
> Yes, thank you for the clarification, but, as ███████████████████
> ████████████████████████████████████████████████
> ████████████████████████████████████████████████
>
> Best,
> Chris
>
> **Christopher G. Salloum | Associate**
> (973) 607-1267
>
> <SignatureTransparent1_88b5a975-0f50-44ae-b6e7-12dd41b6daa3.png>
>
> Mandelbaum Salsburg P.C.
> 3 Becker Farm Road
> Roseland, NJ 07068
>
> **From:** Jason Silberberg <JSilberberg@frierlevitt.com>
> **Date:** Tuesday, June 23, 2020 at 5:38 PM
> **To:** Christopher Salloum <CSalloum@lawfirm.ms>, "Michelle L. Greenberg" <MGreenberg@FrierLevitt.com>
> **Cc:** "Mohamed H. Nabulsi, Esq." <MNabulsi@lawfirm.ms>, Steven Teppler <steppler@lawfirm.ms>
> **Subject:** RE: SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE SOLUTIONS, LLC, Case No. 2:20-cv-07076-JMV-JBC
>
> [EXTERNAL]
> Thank you, Chris. Just to clarify, ██████████████████████
> ████████████████████████████████████████████████
>
> Best,

Jason

Very truly yours,

Jason N. Silberberg, Esq.

<image001.png>

84 Bloomfield Avenue
Pine Brook, NJ  07058
**direct:  (973) 852-8368**
phone:  (973)618-1660
fax:  (973)618-0650
email:  jsilberberg@frierlevitt.com
web:  https://link.edgepilot.com/s/81f72bdb/_qTuVLHGckScu9U-
TsoQhQ?u=http://www.frierlevitt.com/
Follow us on: Linkedin | Twitter | Facebook | Instagram

Frier Levitt COVID-19 Resources

This email and any files transmitted with it are personal confidential
and intended solely for the use of the individual or entity to whom
they are addressed.  They are also subject to the attorney work
product and attorney-client privileges.  If you received this
transmission in error, please notify the sender by reply email and
delete the message and any attachments.  Thank you.

**From:** Christopher G. Salloum <CSalloum@lawfirm.ms>
**Sent:** Tuesday, June 23, 2020 5:34 PM
**To:** Michelle L. Greenberg <MGreenberg@FrierLevitt.com>; Jason Silberberg
<JSilberberg@frierlevitt.com>
**Cc:** Mohamed H. Nabulsi <MNabulsi@lawfirm.ms>; Steven W. Teppler
<steppler@lawfirm.ms>
**Subject:** Re: SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE
SOLUTIONS, LLC, Case No. 2:20-cv-07076-JMV-JBC

Good afternoon, Michelle and Jason:

This confirms our recent conversation in which ███████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████

Best,
Chris

**Christopher G. Salloum** | Associate
(973) 607-1267

<image002.png>

Mandelbaum Salsburg P.C.
3 Becker Farm Road
Roseland, NJ 07068

**From:** Christopher Salloum <CSalloum@lawfirm.ms>
**Date:** Monday, June 22, 2020 at 4:21 PM
**To:** "Michelle L. Greenberg" <MGreenberg@FrierLevitt.com>, Jason
Silberberg <JSilberberg@frierlevitt.com>
**Cc:** "Mohamed H. Nabulsi, Esq." <MNabulsi@lawfirm.ms>, Steven Teppler
<steppler@lawfirm.ms>
**Subject:** SALERNO MEDICAL ASSOCIATES, LLP v. INTEGRITY PRACTICE
SOLUTIONS, LLC, Case No. 2:20-cv-07076-JMV-JBC

Dear Michelle and Jason:

It was good speaking with you briefly earlier this afternoon regarding this matter.



Thanks.  Please let us know if you have any questions.

Best,
Chris

**Christopher G. Salloum** | Associate
(973) 607-1267

<image003.png>

Mandelbaum Salsburg P.C.
3 Becker Farm Road
Roseland, NJ 07068

*This email and any attachments are intended solely for the recipient to whom it is addressed. It may also be an attorney-client communication, and as such is privileged and confidential. Any unauthorized review, use, disclosure or copying of this message is strictly prohibited. If you are not the intended recipient or have received this email in error, delete it immediately and notify the sender.*

Links contained in this email have been replaced. If you click on a link in the email

above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.